2007 OK 55

**Application of Southwestern Bell Telephone, L.P. d/b/a SBC Oklahoma for the Classification of Intrastate Retail Telecommunications Services as Basket 4 Services Pursuant to OAC 165:55–5–66(4).**

**COX OKLAHOMA TELECOM, LLC, Intervening Party/Appellant,**

**v.**

**STATE of Oklahoma ex rel. OKLAHOMA CORPORATION COMMISSION and Southwestern Bell Telephone, L.P. d/b/a SBC Oklahoma, Appellees.**

**AARP Oklahoma, Intervening Party/Appellant,**

**v.**

**State of Oklahoma ex rel. Oklahoma Corporation Commission and Southwestern Bell Telephone, L.P. d/b/a SBC Oklahoma, Appellees.**

**No. 102,392.**

Supreme Court of Oklahoma.

July 3, 2007.

Marc Edwards, Jennifer Kirkpatrick, and Heather Hintz, Phillips McFall McCaffrey McVay & Murrah, P.C., Oklahoma City, Oklahoma, for Appellant, Cox Oklahoma Telecom, LLC.

Clint Russell and Mark H. Ramsey, Taylor, Burrage, Foster, Mallett, Downs & Ramsey, Claremore, Oklahoma, for Appellant, AARP Oklahoma.

Mary Marks Jenkins and John W. Gray, Oklahoma City, Oklahoma; Curtis M. Long and Charles R. Willing, Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Tulsa, Oklahoma; and John Paul Walters, Jr., The Walters Law Firm, Edmond, Oklahoma, for Appellee, Southwestern Bell Telephone, LLC d/b/a SBC Oklahoma.

Elizabeth Ryan, Assistant Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma, for Appellee, State of Oklahoma ex rel. Oklahoma Corporation Commission.[1]

OPALA, J.

¶ 1 The dispositive questions presented for review are: (1) Did the Corporation Commission err in treating this proceeding as legislative rather than judicial? and (2) Is the order under review sustained by law and by substantial evidence? We answer the first question in the negative and the second in the affirmative.

## I

### ANATOMY OF THE PROCEEDINGS

¶ 2 Southwestern Bell Telephone, L.P. d/b/a SBC Oklahoma ("SBC" or "SBC Oklahoma")[2] is an Incumbent Local Exchange Company (ILEC)[3] that provides telecommunications services in Oklahoma. It is regulated by the Oklahoma Corporation Commission (the "Commission") under an alternative regulatory scheme called the Oklahoma Plan.[4] The Oklahoma Plan gives SBC the ability to seek some measure of freedom from regulatory oversight by the Commission depending on the level of competition present in the Oklahoma telecommunications market-

---

1. Identified herein are those counsel for the parties whose names appear on their briefs to this court.

2. Southwestern Bell Telephone, L.P. was doing business as SBC Oklahoma when this cause was heard. The company is now doing business as AT & T Oklahoma. We will continue to refer to appellee as SBC or as SBC Oklahoma in order to maintain consistency with the record for appeal and this opinion.

3. An ILEC is defined in OAC 165:55–1–4 as any telecommunications service provider that was furnishing local exchange service in an area or exchange within the State of Oklahoma on July 1, 1995 pursuant to a Certificate of Convenience and Necessity or grandfathered authority.

4. In the Oklahoma Telecommunications Act of 1997, 17 O.S. Supp.2002 § 135.101 *et seq.*, the legislature directed the Commission "to implement alternative forms of regulation" in the telecommunications industry. The Commission thereafter adopted the Oklahoma Plan and SBC elected to be regulated by its provisions, which are set out at OAC 165:55–5–64 *et seq.* Under the Oklahoma Plan, each of SBC's intrastate retail services was assigned to group of services called a "basket." Each basket specifies a different degree of regulation based ·on the level of competition faced by the services in that basket. The Oklahoma Plan is designed to encourage competition in the telecommunications industry and contemplates a phased decrease in the Commission's regulatory oversight of SBC as competition increases.

place. One of its provisions, OAC 165:55–5–66(4), permits a regulated telecommunications service to be reclassified as competitive if the Commission determines that the service is subject to effective competition and that functionally equivalent and substitute services are available.[5] If found to be competitive, a service is placed into what is figuratively called Basket 4. Price changes of Basket 4 services go into effect immediately and without first having to receive the Commission's approval. SBC applied to the Commission on 21 January 2005 for a competitive reclassification of most of its intrastate retail telecommunications services. Cox Oklahoma Telecom, LLC ("Cox") and AARP Oklahoma ("AARP") intervened to oppose SBC's application.

¶ 3 After receiving prefiled, written testimony from numerous witnesses for each party, the Commission in June 2005 held a two-day hearing on SBC's application. With one commissioner dissenting, the Commission issued its Final Order (the "Order") on 28 July 2005, reclassifying as competitive all but three of SBC's intrastate retail telecommunications services. The Commission also decided a number of collateral issues. The Order did not alter any of SBC's existing intrastate retail rates nor did it affect any of SBC's wholesale services or rates.

¶ 4 Cox appealed from the Order in Cause No. 102,392; AARP filed an appeal in Cause No. 102,461. The separate appeals were consolidated on 14 September 2005 under surviving Cause No. 102,392, which was retained for this court's disposition by a single opinion.

## II

### STANDING TO APPEAL

¶ 5 SBC and the Commission ("appellees") seek dismissal of Cox's appeal for lack of standing. Standing refers to a person's legal right to seek relief in a judicial forum.[6] It is a threshold question that must be decided before any other issue may be addressed.[7] Standing to appeal from an order of the Commission is governed by Article 9, Section 20 of the Oklahoma Constitution,[8] which provides that an appeal may be taken by "any party affected" or "any person deeming himself aggrieved" by an action of the Commission affecting the rates, charges, services, practices, rules or regulations of a public service corporation.[9] The purpose of the standing requirement is to ensure that courts address actual controversies between parties who have sufficient adverse interests.[10] The standing doctrine should never be applied mechanistically to bar from the courthouse those who are truly aggrieved.[11]

¶ 6 Appellees argue that Cox does not have standing to press for corrective relief in this cause because nothing in the Order directly harms Cox's pecuniary interest. We are told by appellees that Cox cannot be

---

5. These requirements are contained in the provisions of OAC 165:55–5–66(4) and OAC 1654:55–5–10.1. Their text is set out, *infra*, at page 163.

6. *Hendrick v. Walters*, 1993 OK 162, ¶ 4, 865 P.2d 1232, 1236; *State ex rel. Cartwright v. Okla. Tax Comm'n*, 1982 OK 146, ¶ 6, 653 P.2d 1230, 1232.

7. *Toxic Waste Impact Group, Inc. v. Leavitt*, 1994 OK 148, ¶ 7, n. 6, 890 P.2d 906, 910, n. 6.

8. The pertinent terms of Article 9, Section 20, Okla. Const. state:

 "*From any action of the Corporation Commission prescribing rates, charges, services, practices, rules or regulations of any public utility or public service corporation,* or any individual, person, firm, corporation, receiver or trustee engaged in the public utility business, *an appeal may be taken by any party affected, or by*

*any person deeming himself aggrieved by any such action,* * * * " (emphasis added.)

9. A telephone company is a public service corporation. *See State ex rel. Henry v. Southwestern Bell Telephone Co.*, 1991 OK 134, ¶ 8, n. 13, 825 P.2d 1305, 1310, n. 13.

10. *Citizens Against Taxpayer Abuse, Inc. v. City of Okla. City*, 2003 OK 65, ¶ 10, 73 P.3d 871, 875.

11. *In re Christina M.*, 280 Conn. 474, 908 A.2d 1073, 1079 (2006) ("Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented....").

injured by the Order because the Order authorizes only legitimate competition in the Oklahoma telecommunications market. According to appellees, the injury Cox fears—anti-competitive or predatory behavior by SBC—is speculative and contingent on future events. It assumes not that injury will result from SBC's adherence to the Order but rather that it will result from conduct that violates the Order. Cox argues in response that the Order causes it injury because it *unlawfully* lifts regulatory oversight of SBC, the effect of which will be increased competition from SBC that will directly, immediately, and substantially harm Cox's pecuniary interest.

■ ¶ 7 We are persuaded that Cox is a proper party to seek corrective relief from the Commission's Order. We have on several occasions held that a person is aggrieved by competition resulting from an *unlawful action* of a government agency.[12] Competitive harm or the threat of competitive harm from the lifting of regulatory oversight has also been held to be a sufficiently concrete

injury to confer standing by the Court of Appeals for the District of Columbia Circuit, which has been faced many times with appellate complaints of injurious actions by federal agencies.[13]

¶ 8 The Order constitutes a departure from the manner in which SBC has been regulated under the Oklahoma Plan. It would give SBC a high degree of pricing freedom based upon the Commission's finding that a new day has dawned in the telecommunications industry in this state—a day in which SBC faces sufficient competition to constrain it from engaging in anti-competitive or predatory pricing. Cox vehemently disagrees with this finding. It argues that competitors in Oklahoma have barely even begun to challenge SBC's market hegemony, making the pricing freedom granted to SBC by the Order premature and a threat to the economic viability of SBC's competitors. We declare this potential for economic harm that results from a diminution in regulatory oversight by the Commission gives Cox standing to press for relief in this appeal.[14]

12. Okla. Gas and Electric Co. v. Okla. Electric Coop. Inc., 1973 OK 158, 517 P.2d 1127 (allegation of illegal competition sufficient to confer standing); *Bank of the Lakes v. First State Bank,* 1985 OK 81, 708 P.2d 1089 (no standing to appeal from Banking Commission's order permitting another bank to compete with appellant based on increased *lawful* competition); *Missouri–Kansas–Texas Railroad Company v. State,* 1985 OK 108, 712 P.2d 40 (allegation that grant of license to competitor to build and operate a coal slurry pipeline was unconstitutional and unsupported by the evidence together with evidence of pecuniary injury sufficient to confer standing); *Community Bankers Ass'n v. Okla. State Banking Bd.,* 1999 OK 24, 979 P.2d 751 (order of the State Banking Board authorizing a bank located in Vian to operate a branch bank in Checotah violated the statutes on branch banking, created unlawful competition for the existing bank in Checotah, and therefore gave the existing bank standing to appeal from the order). *See also Heritage Village Apartments, Ltd. v. Okla. Housing Finance Agency,* 2001 OK CIV APP 4, 18 P.3d 1085 (competitors of apartment builder did not have standing to appeal from order of state agency awarding federal tax credits to apartment builder to be used for building apartments and low income housing because competitors' sole injury was from lawful competition).

13. *See e.g., MD Pharm., Inc. v. DEA,* 133 F.3d 8, 11 (D.C.Cir.1998), *quoting Liquid Carbonic Industries Corp. v. FERC,* 29 F.3d 697, 701 (D.C.Cir.1994) ("increased competition repre-

sents a cognizable Article III injury"); *Old Town Trolley Tours, Inc. v. Washington Metro. Area Transit Comm'n,* 129 F.3d 201, 202 (D.C.Cir. 1997); *Associated Gas Distributors v. FERC,* 899 F.2d 1250, 1258 (D.C.Cir.1990); *Investment Co. Inst. v. FDIC,* 815 F.2d 1540, 1543 (D.C.Cir. 1987). *See also Investment Co. Inst. v. Camp,* 401 U.S. 617, 620–21, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971). The D.C. Circuit's reasoning is seen in *New England Public Communications Council, Inc. v. Federal Communications Commission,* 334 F.3d 69 (D.C.Cir.2003), in which the FCC argued that to have standing, the petitioners had to show that they had already suffered financial injury. The court disagreed, reasoning that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." The court acknowledged that the competitive injury complained of might never materialize because of intervening decisions of other actors, but said that absolute certainty of injury was not necessary. "It suffices," the court said, "for [petitioners] to show that the [Order] has 'the clear and immediate potential ... to hurt them competitively,'" and further that "this court 'has not required litigants to wait until increased competition actually occurs.'" *Id.*

14. Our decision means only that Cox is entitled to have the court consider the merits of this dispute. A party should not have to prove that an action is unlawful in order to have standing to

## III

### STANDARD OF REVIEW

¶ 9 The power to review Commission decisions is vested in this court by the Oklahoma Constitution, Art. 9 § 20.[15] That provision fashions two standards of review—a *de novo* standard for appeals based on alleged violations of constitutional rights and a more deferential standard for all other appeals.[16] Today's pronouncement employs both standards.[17] Because Commission decisions often involve complex issues of economics, accounting, engineering, and other special fields of knowledge, a presumption of correctness accompanies the Commission's findings in matters it frequently adjudicates and in which it possesses expertise.[18]

## IV

### THE COMMISSION CORRECTLY TREATED THIS PROCEEDING AS LEGISLATIVE IN NATURE

¶ 10 The Commission ruled that SBC's application should be treated as a legislative matter. Appellants argue that this decision constitutes reversible error. Initially, we note that neither Cox nor AARP ("appellants") objected below to treating this proceeding as legislative. This omission would ordinarily preclude our review of appellants' contention,[19] but the rule has an exception that permits review of an alleged deprivation of due process of law despite failure to preserve it below.[20] While appellants do not use

---

level that attack. *See Independent School Dist. No. 9 of Tulsa County v. Glass*, 1982 OK 2, ¶ 10, 639 P.2d 1233, 1237 (standing does not depend on the merits of the plaintiff's contention that particular conduct is illegal); *Louisiana Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C.Cir.1998).

15. *See supra* note 8 for the pertinent provisions of Article 9, Section 20, Okla. Const.

16. The pertinent portion of Article 9, Section 20, Okla. Const. states:

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence . . ."

Under the *de novo* standard of review, the court has plenary, independent and non-deferential authority to determine whether the trial tribunal erred in its factual findings or in its legal rulings. *Neil Acquisition v. Wingrod Investment Corp.*, 1996 OK 125, ¶ 5, 932 P.2d 1100, 1103; *Fanning v. Brown*, 2004 OK 7, ¶ 8, 85 P.3d 841, 845. The deferential standard of review extends no further than determining whether the Commission adequately performed its duty under federal and state law and whether the Commission's findings are supported by substantial evidence. *Smith Cogeneration Management, Inc. v. Corp. Comm'n*, 1993 OK 147, ¶ 9, 863 P.2d 1227, 1232; *Forest*

*Oil Corp. v. Corp. Comm'n*, 1990 OK 58, ¶ 32, 807 P.2d 774, 788.

17. We review *de novo* the Commission's decision to treat this proceeding as legislative rather than judicial because a constitutional question is implicated. All other issues in this appeal are reviewed under the more deferential standard of review.

18. *MCI Telecommunications Corp. v. State*, 1991 OK 86, ¶ 22, 823 P.2d 351, 358; *Turpen v. Okla. Corp. Comm'n*, 1988 OK 126, ¶ 16, 769 P.2d 1309, 1317.

19. To preserve an issue for appellate review a party must ordinarily make its objection known to the trial tribunal. *See* the provisions of 12 O.S.2001 630, which state:

"Formal exceptions to rulings or orders of the court shall not be necessary; but for all purposes for which an exception has heretofore been necessary at the trial of a cause it shall be sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor."
*See also McMillan v. Lane Wood & Co.*, 1961 OK 95, ¶ 9, 361 P.2d 487, 490; *Jones v. Okla. City Urban Renewal Auth.*, 1973 OK 65, ¶ 13, 514 P.2d 661, 665; *State v. Okla. Natural Gas Co.*, 1982 OK 11, ¶ 12, 640 P.2d 1341, 1346; *Prairie Exploration v. Tri Star Energy, L.L.C.*, 2002 OK CIV APP 110, ¶ 6, 84 P.3d 788, 790.

20. *Pettit v. Amer. Nat'l Bank of Austin*, 1982 OK 85, ¶ 9, 649 P.2d 525, 529. Both the rule and the exception apply equally to proceedings before agencies as to those heard in a judicial forum. *Holzbierlein v. State*, 1946 OK 247, ¶ 6, 197 Okla. 509, 172 P.2d 1007, 1010; *State v. Okla. Natural Gas Co., supra* note 19.

the term due process to describe their attack, they claim that the Commission's decision to treat this proceeding as legislative rather than judicial resulted in a hearing that was fundamentally unfair. The flaws alleged to inhere in the hearing include lobbying, *ex parte* contacts, and a failure of the Commission to follow its own rules. The gist of these allegations is that the legislative designation of this proceeding led to a violation of appellants' right to receive the benefit of due process. We will therefore consider this proposition of error despite appellants' failure to object below.

¶ 11 Both appellants and appellees rely on the landmark decision by the United States Supreme Court in *Prentis v. Atlantic Coast Line Company*,[21] which defined a judicial inquiry as one which "investigates, declares, and enforces liabilities as they stand on present and past facts and under laws supposed already to exist" and defined a legislative proceeding as one that "looks to the future and changes existing conditions by making a new rule to be applied thereafter."[22] This court has adopted *Prentis's* classic definition of legislative and judicial proceedings and has held that the kind of process that is a litigant's due flows from the label attached by law to a proceeding.[23]

¶ 12 Appellants argue that SBC's application exhibits the essential characteristics of a judicial proceeding as defined by *Prentis*. They contend that the Commission examined present and past facts regarding the extent of competition in the Oklahoma telecommunications market, applied existing Commission rules to those facts, and decided, after vigorous contest, that SBC's services were subject to effective competition and entitled to be placed in Basket 4.

¶ 13 Appellees argue that SBC's application displays the typical qualities of a legislative proceeding as defined by *Prentis*. The question of competition among telecommunications service providers calls for a policy assessment that will determine how SBC's rates will be set in the future. **It is hence similar, although not identical, to a rate hearing**. Appellees also argue that in ruling on the competitiveness of the Oklahoma telecommunications market, the Commission is not exercising its dispute-settling function by declaring and enforcing liabilities as it would in judicature, but is instead establishing a rule for the future, equally applicable to all telecommunications service providers.

■ ¶ 14 The line between what is legislative and what is judicial is not always a clear one, **but we agree with the Commission that this proceeding is more akin to legislation than to adjudication**. We see the Commission's role in this cause as similar to that of a legislative committee engaged in fact-finding for the purpose of legislation. The Commission was not charged with arriving at a strictly accurate reconstruction of past events in order to settle a private dispute between the parties, but rather with establishing a rule to guide it in making decisions about the telecommunications industry in the future. The Commission's inquiry required it to hear testimony and argument from contending factions and witnesses, but the fact that there was conflicting evidence and parties standing in opposition to the relief requested does not make the proceeding judicial. Proposed legislation often engenders heated contest between those who favor it and those who oppose it.

¶ 15 We also conclude that while this was not a ratemaking proceeding *per se*. it was closely related to ratemaking.[24] The rule it

---

**21.** 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908).

**22.** *Id.* at 226, 29 S.Ct. 67, 69 ("A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power....").

**23.** *Southwestern Bell Telephone Co. v. Okla. Corp. Comm'n*, 1994 OK 38, ¶ 9, 873 P.2d 1001, 1005.

**24.** While we agree with the dissenter that the mere fact rates are involved in a proceeding does not *automatically* make that proceeding legislative, we firmly reject the notion (which is at least implied in the dissenting statement) that a proceeding which does not set rates must automatically be excluded from the legislative rubric. The crux of this proceeding, i.e. what is being decided, is closely enough aligned with the setting of rates to support the Commission's charac-

establishes will permit SBC to determine its own rates in the future with only minimal regulatory supervision. Ratemaking has been definitively labeled and treated as legislative.[25]

¶ 16 Despite the legislative characterization the Commission gave to this proceeding, we note that the parties were afforded many of the due process protections associated with a judicial proceeding, including notice and opportunity to be heard, the right to present their own witnesses, and the right to cross examine opposing witnesses. As for the allegations of improper communications, legislative proceedings are not governed by judicial standards of communication among decision-makers or between decision-makers and others.[26]

## V

## THE COMMISSION'S REFUSAL TO DISMISS SBC'S APPLICATION AS PREMATURELY FILED WAS NOT CONTRARY TO LAW

¶ 17 An ILEC which is regulated under the Oklahoma Plan must wait until the expiration of five years from the date it opted to be regulated under the Oklahoma Plan to petition for a competitive reclassification.[27] The rule applies to two types of services: basic local residential service and local operator services. SBC's application sought reclassification of services subject to the five-year rule as well as services not subject to that rule. The application was filed on 21 January 2005. Because SBC opted to be regulated under the Oklahoma Plan on 12 June 2000, appellants argued before the Commission that the application, insofar as it requested reclassification of services subject to the five-year rule, was approximately six months premature and should be dismissed. The Commission agreed that the application was premature, but granted SBC's motion for a waiver of the five-year waiting period. Appellants now argue that the Commission erred in granting the waiver.

¶ 18 The Commission cannot arbitrarily ignore its duly-promulgated procedural rules,[28] but it is expressly authorized by the Oklahoma Administrative Code to waive its rules under certain circumstances. The pertinent rule states:

---

terization of this proceeding as legislative. The cases cited by the dissent do not contradict this conclusion. Both involve the *statutory investiture of the Commission with judicial power* to determine the amount of refund due and to identify the proper recipients in all disputes in which a claim is made that a public service corporation has charged an amount in excess of the lawful rate for a service. *See* the provisions of 17 O.S. §§ 121–122. Not only are those cases governed by a statute declaring the Commission's power to be judicial, but neither of the disputes involved in those cases is related to rates or rate making in a remotely similar fashion to that present in this proceeding.

25. *Wiley v. Okla. Natural Gas Co.*, 1967 OK 152, ¶ 3, 429 P.2d 957, 958; *Turpen v. Okla. Corp. Comm'n*, 1988 OK 126, ¶ 76, 769 P.2d 1309, 1332.

26. In *Southwestern Bell Telephone Co. v. Okla. Corp. Comm'n*, supra note 23, the court held that utility companies have no right to an unbiased decision-maker in a ratemaking proceeding. *Id.* at ¶ 16, at 1007. *In Wiley v. Okla. Natural Gas Co.*, supra note 25, we held that the legislative decision-making process in a ratemaking proceeding is not subject to due process attack based on an allegation that the Commission had been wrongfully influenced to approve rate in-

creases by contributions and favors from a lobbyist *Id.* at ¶¶ 2–3, at 958. The court has on several occasions stated that due process notice and hearing requirements are not applicable to a legislative proceeding such as ratemaking. *State v. Southwestern Bell Telephone Co.*, 1983 OK 40, ¶ 34, 662 P.2d 675, 681; *Chickasha Cotton Oil Co. v. Corp. Comm'n*, 1977 OK 40, ¶ 6, 562 P.2d 507, 509.

27. The provisions of OAC 165:55–5–66(1)(A)(ii) state in pertinent part: "An ILEC may petition the Commission for a determination of competition following the expiration of the Five Year Period pursuant to OAC 165:55–5–10.1." The phrase "the Five Year Period" refers to a preceding provision and means five years after the date the ILEC opts to be regulated under the Oklahoma Plan. SBC argued before the Commission that this rule only bars a *decision* to reclassify services prior to the expiration of the five-year waiting period, but permits the earlier filing of an application. The Commission interpreted the rule to bar the filing of an application within five years. SBC did not seek review of that ruling.

28. *Henry v. Okla. Corp. Comm'n*, 1990 OK 103, ¶ 15, 825 P.2d 1262, 1267; *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

"Whenever compliance with any requirement of this Chapter [Chapter 55–Telecommunications Services] would result in unreasonable hardship upon or excessive expense to the telecommunications service provider, IXC or the end-user, or for other good cause shown, the Commission may, by order, waive or modify the requirements of this Chapter upon application of any interested person. The Commission may grant temporary relief pending hearing." [29]

The court has declared that in applying this rule, the vice to be avoided is the arbitrary or capricious exercise of power and, to that end, has imposed on the Commission an obligation to give a reasoned explanation when it chooses to waive a rule.[30]

¶ 19 The Commission provided the following explanation for waiving the five-year rule in this cause:

"[I]t is in the public interest to waive OAC 165:55–5–66(1)(A)(ii). SBC has already met the time requirement for requesting changes to the rates for business services and although the Five Year Period will not expire regarding the residential service until June 15, 2005, judicial economy would be best served by hearing the testimony regarding business rates and residential rates in the same hearing. Therefore, the Commission finds there is good cause to waive OAC 165:55–5–66(1)(A)(ii)."

■ ¶ 20 Appellants argue that this statement is insufficient to justify the waiver. We disagree. The Commission found that the preservation of judicial resources constitutes good cause to waive the rule. Good cause means a fair and honest reason, one which is not trivial, arbitrary, capricious, or concocted for the occasion. Only if the reason provided is so irrational as to render the decision arbitrary and capricious should it be reversed.[31] **We believe the Commission has provided a rational and defensible basis for granting the waiver.** Because the five-year rule applies to only two categories of services and because the evidence would essentially be the same for all services, the Commission concluded that strict adherence to the rule would entail multiple proceedings resulting in a waste of judicial resources.[32] While the Commission could have avoided multiple hearings in other ways, its choice to waive the requirement was not arbitrary or capricious. We note that the hearing on the application in this cause did not take place until after the expiration of the five-year moratorium. Appellants therefore had the opportunity to inform the Commission of any changes in the competitive landscape of the telecommunications industry in Oklahoma up to the date of the hearing.

## VI

## THE COMMISSION DID NOT ERR IN PLACING SBC'S RECLASSIFIED SERVICES INTO BASKET 4 AT THEIR EXISTING PRICES

¶ 21 Appellants argue that the Commission erred in placing SBC's services into Basket 4 at their existing tariff prices. Appellants point out that the provisions of OAC 165:55–5–66(4)(B) state that the price of a service in Basket 4 will equal or exceed the service provider's long-run incremental cost (LRIC) of providing the service or will be arrived at

---

29. OAC 165:55–1–6.

30. *Henry, supra* note 28 at ¶ 18, at 1267–68 (stating that "[i]f the Commission wishes to make an exception to the application of a rule which speaks in mandatory and unambiguous language it must reasonably explain the reasons for making the exception. . . . Any deviation from a procedural rule must be explained on the record to insure that the deviation is not made arbitrarily and capriciously").

31. *Umholtz v. City of Tulsa,* 1977 OK 98, ¶ 40, 565 P.2d 15, 25.

32. In its explanation for waiving the five-year rule, the Commission refers to "judicial" economy and, in this opinion, we too use the adjective "judicial" as a generic term to describe the resources that would be wasted by holding multiple proceedings. While the term "judicial" commonly refers to the judiciary, it should go without saying that we are not using the adjective here to refer to a particular branch of the government. In this context, it simply refers to the waste of *governmental resources* the Commission sought to avoid by granting the waiver. No one should misconstrue the use of this adjective as contradicting our holding that this proceeding is legislative in nature.

by applying imputation where appropriate.[33] The Commission ruled that this provision does not impose LRIC pricing as a *precondition* to Basket 4 placement, but instead permits services to be placed in Basket 4 at a price other than LRIC and reserves to the Commission the power to review those prices in the future for compliance with the LRIC price standard. Accordingly, the Commission ruled that evidence of the LRIC of the services for which relief was requested was not required **at this proceeding** and placed SBC's services into Basket 4 at the lower of their tariffed price as of the date of the Order or their LRIC.

¶ 22 Appellants argue on appeal that the Commission violated its own pricing rule, which they say mandates LRIC or imputed pricing before services can be placed into Basket 4. In order to comply with this rule, appellants contend, the Commission had to obtain from SBC LRIC cost studies of the services under consideration for reclassification, but contrary to the clear import of the rule, the Commission wrongly decided that LRIC cost studies were not necessary. Instead, the Order places services into Basket 4 without any evidence of their LRIC and at prices which, appellants assert, are in all likelihood less than LRIC.[34] Anticipating that appellees might claim the Commission waived the rule, appellants argue that any attempt to claim the rule was waived must fail inasmuch as the Commission did not announce a decision to waive the rule nor provide a reasoned explanation for waiving it.

¶ 23 This court will show great deference to an agency's interpretation of its own rules.[35] When the terms of a regulation are amenable to more than one meaning, we ordinarily defer to the interpretation adopted by those charged with the duty of administration.[36] When choosing between two or more possible meanings of a regulation, controlling weight may be given to long-continued administrative usage unless it is plainly erroneous or inconsistent with the language.[37] Deference to an agency's interpretation is even more clearly in order when the construction is that of an administrative regulation rather than a statute.[38]

¶ 24 The Commission's interpretation of OAC 165:55–5–66(4)(B) is not plainly erroneous or inconsistent with the rule's language. Subsection A of the rule states that services which meet certain criteria *will be* placed in Basket 4.[39] To read Subsection B as appellants suggest would impose an additional requirement for reclassification that would interfere with the operation of the mandatory language of Subsection A. It is hence reasonable to interpret OAC 165:55–5–66(4) as setting up a multi-stage process that permits reclassified services to be placed into Basket 4 at a price other than LRIC with scrutiny for compliance with the price floor to follow, if necessary.

¶ 25 The Commission's decision to utilize the existing tariff prices of SBC's services as an initial price floor for Basket 4 services is consistent with the general intent of Section 66(4)(B), which is to prevent anti-competitive or predatory pricing. There appears to be general agreement among the parties to this proceeding that the existing tariff prices of SBC's services were set many years ago and have ever since been determined by the

---

**33.** The provisions of OAC 165:55–5–66(4)(B) state in pertinent part:
"(B) The price floor for all services in this Basket will be the greater of the LRIC [Long Run Incremental Cost] of the service under consideration or a price which is arrived at by applying imputation where appropriate."

**34.** It was presumed by all parties that the current tariff prices of most if not all of SBC's services were lower than the LRIC of the services inasmuch as the existing prices were determined either in the 1980's or in 1997 at the latest.

**35.** *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

**36.** *Bell v. Phillips Petroleum Co.*, 1982 OK 28, ¶ 24, 641 P.2d 1115, 1121.

**37.** *Id.*

**38.** *Id.*

**39.** The provisions of OAC 165:55–5–66(4)(A) state:
"Services which are competitive, pursuant to OAC 165:55–5–10.1, and for which functionally equivalent and substitute services are available *will be placed in Basket 4.*" (emphasis added)

Commission to be just and reasonable. No one, including appellants, has suggested that the existing prices of SBC's services are predatory or anti-competitive. If the Commission were compelled to price SBC's services at LRIC as a prerequisite to reclassification, it would almost certainly mean that rates would increase. It is unlikely the Commission intended a rule meant to benefit the public through increased competition to **automatically** result in a price increase in the absence of some indication that the current prices are anti-competitive.[40]

¶ 26 The Commission's decision is also supported by the fact that the introductory sentence to OAC 165:55–5–66 authorizes services to be priced at their existing tariff prices upon a provider's election to be regulated under the Oklahoma Plan.[41] The price floor for Basket 3 is the LRIC of the service plus 20%; the price floor for Basket 4 is the LRIC of the service. Nothing in this record tells us whether any services were placed into these baskets when SBC opted to be regulated under the Oklahoma Plan,[42] but the introductory sentence of the rule clearly authorizes the use of existing tariff prices upon implementation of the Oklahoma Plan despite the LRIC-related price floors for Basket 3 and Basket 4 services specified in the rules.

¶ 27 Finally, LRIC cost studies have apparently not been required in previous proceedings for Basket 4 reclassification.[43] The Commission's refusal to require cost studies in this proceeding thus appears to be consistent with its treatment of this issue in other similar proceedings.

## VII

### THE COMMISSION DID NOT ERR IN ADMITTING INTO EVIDENCE TESTIMONY BASED ON THE E911 DATABASE AND TWO SURVEYS OF TELEPHONE SERVICE CUSTOMERS

¶ 28 Appellants unsuccessfully objected below to the admission of testimony based on the E911 database, a collection of telephone numbers administered by SBC which is maintained to enable emergency services to be dispatched to a specific location associated with a particular telephone number. SBC offered the testimony to show the number of access lines attributable to facilities-based landline competitors.[44] Cox argues that the database overstates the number of facilities-based wireline access lines and should have been excluded as unreliable.

¶ 29 Appellants also objected unsuccessfully to the admission of two surveys conducted

---

**40.** *McClure v. Conoco–Phillips Co.*, 2006 OK 42, ¶ 25, 142 P.3d 390, 398 (stating that "[a] rule, like a statute, is construed reasonably and sensibly in preference to a construction which renders all, or a portion thereof, useless or permits absurd consequences").

**41.** The provisions of OAC 165:55–5–66 begin in part by saying,
"The prices for services provided by an ILEC once the ILEC has implemented the Oklahoma Plan shall be determined according to the level of competition for each service. *At the time of election into the Plan, services will be priced according to the current existing tariff prices as approved by the Corporation Commission.*" (emphasis added)

**42.** SBC tells us in its appellate brief that its services were placed into Basket 1 (non-competitive services), Basket 2 (access services), and Basket 3 (emerging competitive and optional services).

**43.** SBC's counsel pointed out during a hearing in this cause that there have been at least two other instances of services being moved to Basket 4

and that in neither of those cases were rates reviewed to determine whether they met the LRIC price floor. Neither the Commissioners nor any party voiced any disagreement that two such proceedings had been conducted. In its brief on appeal, SBC identified three reclassification proceedings where LRIC was not raised as an issue: Order No. 48913 issued in Cause No. PUD 200300708; Order No. 458168 issued in Cause No. PUD 200100277; and Order No. 458168 issue in Cause No. PUD 200100277. None of these orders was included in the appellate record, but neither Cox nor AARP in their reply briefs suggests that this is factually incorrect.

**44.** Facilities-based provider is defined in OAC 165:55–1–4 as: "an entity providing telecommunications services predominately through the use of its own facilities, including UNEs [Unbundled Network Elements], and other technologies capable of meeting all local telecommunications service requirements while complying with the Commission's quality of service rules."

on behalf of SBC which consist of interviews of wireless and wireline subscribers and to the testimony given in connection with those surveys. The surveys were offered by SBC to prove that it faces competition not only from other wireline service providers, but also from wireless telephone service and VoIP (Voice over Internet Protocol), a broadband-based telephony product.

¶ 30 Under the Oklahoma Evidence Code, the trial tribunal stands as a "gatekeeper," admitting or excluding evidence based on the hearing officer's assessment of its relevance and reliability.[45] All relevant evidence is admissible,[46] unless the trial tribunal determines that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."[47] A trial tribunal has discretion in deciding whether proffered evidence is relevant and, if so, whether it should be admitted, and a judgment or order will not be reversed based on a hearing officer's ruling to admit or exclude evidence absent a clear abuse of discretion.[48]

■ ¶ 31 Notwithstanding appellants' critique of the reliability of the E911 database, substantial evidence is present in the record from which the Commission could have concluded that the E911 database provides a **reasonable estimate** of facilities-based landline competition. No abuse of discretion hence attended the Commission's decision to admit into evidence testimony derived from the database.

■ ¶ 32 Cox has also failed to demonstrate that the Commission abused its discretion in admitting the surveys. At the outset, we note that the surveys *were admitted into evidence without objection from Cox or AARP at the pre-hearing conference* held on 13 June 2005. It was not until the first day of testimony that Cox began to object to their admission, challenging them on the grounds of hearsay and lack of proper foundation. The objection was summarily overruled without the benefit of argument. The next day, Cox filed a written motion to exclude the surveys with brief attached. The Commission never ruled on the written motion. Cox included both the hearsay and proper foundation arguments in its list of issues to be argued on appeal, but *mentioned lack of proper foundation and authentication as objections only in a terse footnote in its brief-in-chief.* After SBC and the Commission filed their answer briefs, in which neither reacted to Cox's footnote, Cox filed a reply brief in which it briefly argued *sans* authority that the surveys should be deemed inadmissible for lack of authentication.

¶ 33 The court has on many occasions said that judicial review will not be given to issues that receive only superficial treatment in an appellate brief or to assignments of error that lack a reasoned argument or supporting authority.[49] The footnote in Cox's brief-in-chief does no more than mention in passing appellants' objections to the surveys. It clearly falls short of meriting judicial attention. Cox's attempt in its reply brief to raise the issue of authentication must also be rejected as too little too late. New arguments may not be raised for the first time in a reply

**45.** *Myers v. Missouri Pacific RR. Co.*, 2002 OK 60, ¶ 36, 52 P.3d 1014, 1033; *Cities Service Co. v. Gulf Oil Corp.*, 1999 OK 14, ¶ 32, 980 P.2d 116, 132, *cert. dismissed.* 528 U.S. 1014, 120 S.Ct. 523, 145 L.Ed.2d 404 (1999).

**46.** The terms of 12 O.S.2001 2402 provide:
"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Oklahoma, by statute or by this Code. Evidence which is not relevant is not admissible."

**47.** See the terms of 12 O.S.2001 2403, which provide:

"Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."

**48.** *Kerr v. Clary*, 2001 OK 90, ¶ 15, 37 P.3d 841, 844 (applying abuse of discretion standard to admission of hearsay); *In re JDH*, 2006 OK 5, ¶ 4, 130 P.3d 245, 247.

**49.** *S.W. v. Duncan*, 2001 OK 39, ¶ 31, 24 P.3d 846, 857; *Beets v. Metropolitan Life Ins. Co.*, 1999 OK 15, ¶ 9, 995 P.2d 1071, 1074.

brief.[50] Cox's attempt to incorporate by reference its earlier motion to exclude the surveys and brief in support, filed below, must also be rejected. Not only does it violate the rule against presenting new arguments in a reply brief, but it also conflicts with Oklahoma Supreme Court Rule 1.11(f), which sets out the requirements for the statement and support of propositions in appellate briefs. It clearly states that the contentions of the parties "must be set forth in separate propositions" and "[t]he argument and authorities in support of each proposition must follow the statement of the proposition." [51] Appellants bear the burden of showing that the admission of the surveys was an abuse of the Commission's discretion. They have failed to do so and we will not reverse the Commission's evidentiary ruling absent adequate reason.

## VIII

### EVIDENTIARY ISSUES

¶ 34 Two provisions of the Oklahoma Plan govern the competitive reclassification of telecommunications services. The provisions of OAC 165:55–5–66(4) ("Section 66(4)") create the category of competitive services, identify the standard for measuring competition, and set the pricing and tariffing consequences of Basket 4 placement. That provision states:

**Basket 4—Competitive Services.**

[10] (A) Services which are competitive, pursuant to OAC 165:55–5–10.1, and for which functionally equivalent and substitute services are available will be placed in Basket 4.

(B) The price floor for all services in this Basket will be the greater of the LRIC of the service under consideration or a price which is arrived at by applying imputation where appropriate.

(C) Price revisions to the tariffs for services in Basket 4 shall become effective on the date specified on the revised tariff sheets after the provider has delivered 3 copies of the revised tariff sheets to the Director of the Public Utility Division. The effective date shall be no earlier than the date the revised tariff pages are delivered.

¶ 35 The second provision is OAC 165:55–5–10.1 ("Section 10.1"), the section of the Oklahoma Administrative Code incorporated by reference into Subsection A of Section 66(4), as set out above. It contains a five-part, non-exclusive assessment for determining whether a regulated telecommunications service is "subject to effective competition." Section 10.1 states:

**Competitive services**

(a) A telecommunications service provider may file an application to have the Commission determine that a regulated telecommunications service, other than local directory assistance or operator services is subject to effective competition and is therefore competitive for the applicant and/or the applicant class.

(b) In determining whether a service is competitive, factors the Commission will consider include, but are not limited to:

(1) The number and size of alternative providers of comparable services;

(2) The extent to which comparable services are available from alternative providers in the relevant market;

(3) The ability of alternative providers to make functionally equivalent or substitute services readily available at competitive rates and terms and conditions;

(4) Public interest considerations; and,

(5) Other indicators of market power with respect to a service, which may include market share, growth in market share and whether the alternative provider(s) of comparable services are affiliated with the telecommunications service provider.

---

**50.** *McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, ¶ 28, 637 P.2d 583, 588.

**51.** The provisions of Rule 1.11(f), Oklahoma Supreme Court Rules, state:
"**Separate Propositions.** The main contentions of the parties must be set forth in separate propositions. The argument and authorities in support of each proposition *must follow* the statement of the proposition. Briefs in every proceeding, whether appellate or original jurisdiction, shall comply with Rule 1.11(f)." (emphasis added)

(c) In considering these and other factors, the Commission is not required to give equal weight to each factor in subsection (b) of this Section, but has discretion to give more weight to a particular factor or factors, based on the evidence.

¶ 36 The Commission received a voluminous amount of conflicting evidence related to the factors set out in these two rules and made a host of factual findings based upon the evidence presented. Appellants challenge most of these findings as unsupported by substantial evidence. The term "substantial evidence" means "more than a mere scintilla" [52] but a quantum that may be less than the weight of the evidence.[53] It is proof that possesses something of real and relevant consequence and that carries with it a fitness to induce conviction.[54] In testing evidence for substantiality, a reviewing court must consider not only the evidence supporting the decision, but also the evidence which detracts from it.[55] The court has held that searching a record for substantial evidence that supports an order does not entail a comparison of the parties' evidence to determine that which is most convincing.[56] Instead, if the evidence supporting an order possesses a quality of proof inducing a conviction that the evidence furnished a substantial basis of facts from which the issue could be reasonably resolved, it is sufficient.[57] In cases before the Commission involving the testimony of expert witnesses, a factual finding is supported by substantial evidence when the evidence is offered by a qualified expert who has a rational basis for his/her views, even if other experts disagree.[58] It is for the Commission, not the court, to weigh conflicting expert testimony.[59]

¶ 37 Appellants also attack several of the Commission's findings for lack of adequate content. We have said that the Com-

**52.** *Mustang Production Co. v. Okla. Corp. Comm'n,* 1989 OK 35, ¶ 14, 771 P.2d 201, 204.

**53.** *Teleco, Inc. v. Okla. Corp. Comm'n,* 1982 OK 124, ¶ 6, 653 P.2d 209, 212. The United States Supreme Court has described substantial evidence as "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Board v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

**54.** *Tecumseh Gas System, Inc. v. State,* 1977 OK 20, ¶ 22, 565 P.2d 356, 359. As the United States Supreme Court noted in *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.". *Id.* at 401, 402 U.S. 389, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842.

**55.** *Marathon Oil Co. v. Okla. Corp. Comm'n,* 1994 OK 28, ¶ 18, 910 P.2d 966, 970; *El Paso Natural Gas Co. v. Okla. Corp. Comm'n,* 1981 OK 150, ¶ 9, 640 P.2d 1336, 1338–39 (adopting the view expressed by the United States Supreme Court in *Universal Camera Corp. v. Nat'l Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951) that "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). For an account of the development of the substantial evidence test, see Larry Derryberry and Patrick D. Shore, *"Public Utility Regulation in Oklahoma: An Historical Perspective,"* 19 Oklahoma City University Law Review 465 (Fall 1994).

**56.** *Union Texas Petroleum v. Okla. Corp. Comm'n,* 1981 OK 86, ¶ 31, 651 P.2d 652, 662.

**57.** *Id. See Kenneth Culp Davis,* 4 Administrative Law Treatise, § 29.02 at 118 (1958), *citing Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217 83 L.Ed. 126 (1938) and *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939), in which substantial evidence is defined as follows:

"In recent decades the principal guide to the meaning of substantial evidence has been a Supreme Court statement written by Chief Justice Hughes: 'Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' A later statement clarifies further: Substantial evidence 'means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred.... (I)t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *See also St. Louis–San Francisco Ry. Co. v. State,* 1970 OK 225, ¶ 8, 478 P.2d 354, 356.

**58.** *Public Service Co. of Okla. v. State ex rel. Okla. Corp. Comm'n,* 2005 OK 47, ¶ 8, 115 P.3d 861, 870.

**59.** *Id.*

mission's rulings must have content sufficient to permit a reviewing court to determine whether there was substantial evidence in support of a decision.[60] This is not a requirement that the Commission recite in its orders all the evidence in support of its decision or that it address every item of evidence supporting a contrary decision.[61] Commission rules require that body to provide, *inter alia*, a summary of the evidence adduced by all parties of record, findings of fact, containing all ultimate facts found to have been established, and conclusions of law, containing all applicable legal conclusions and a concise statement of what the order mandates.[62] An order substantially conforming to this rule cannot be assailed for lack of adequate content.

### A. Relevant Product Market

¶ 38 Sections 10.1 and 66(4) use a variety of terms to describe the services that must be available from competing providers to justify a finding of effective competition. These include "functionally equivalent services," "substitute services," and "comparable services." All such terms relate to the concept of product market. The Commission found that the important determinant of whether two services are in the same product market is their "reasonable interchangeability of use." It also found that services do not have to be identical to be in the same product market.

■ ¶ 39 Cox argues without citation to authority that the standard should be whether a service is "truly interchangeable," not just reasonably interchangeable. We disagree. There is abundant authority defining the concept of relevant product market as the pool of goods or services that enjoy *reasonable interchangeability of use*.[63] We hold

60. *Southwestern Bell Telephone Co. v. State*, 1992 OK 5, ¶ 11, 825 P.2d 262, 265; *Turpen v. Okla. Corp. Comm'n*, 1988 OK 126, ¶¶ 89–90, 769 P.2d 1309, 1335 (holding that a finding which does no more than reference previous Commission treatment of a subject and a staff proposal leaves too much to conjecture and speculation). Additional reasons for the adequate content requirement include "facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearing and judicial review, and keeping agencies within their jurisdiction." Kenneth Culp Davis, 2 ADMINISTRATIVE LAW TREATISE, § 16.05 at 444–49 (1958), *quoted* in *Jackson v. Independent School Dist. No. 16 of Payne County*, 1982 OK 74, ¶ 12, n. 19, 648 P.2d 26, 31, n. 19.

61. A failure to cite specific evidence does not necessarily indicate that it was not considered. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000). A tribunal need not discuss every piece of evidence in the record. *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir.2003); *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir.2001).

62. *See* the provisions of OAC 165:5–15–1, which state in pertinent part:
(a) Contents of orders. The Commission may prescribe a standardized format for all orders. Every order of the Commission shall contain the following where appropriate or except where the Commission determines otherwise: (1) Caption, cause number on the appropriate docket and order number. (2) Appearances. (3) Date and place of all hearings.
(4) Summary of allegations of applicant, and of all other parties of record. (5) Summary of evidence of applicant, and of all other parties of record. (6) Findings of fact, containing all ultimate facts found to have been established. (7) Conclusions of law, containing: (A) All legal conclusions found to be applicable to the facts; and (B) The directive of the order stated in concise and mandatory language. (8) Signature of the Secretary certifying as to all Commissioners participating in making the order. (9) Seal of the Commission. (10) Date of filing, and effective date where appropriate.

63. *Teleco, Inc. v. Ford Industries, Inc.*, 1978 OK 159, ¶ 15, 587 P.2d 1360, 1364 (stating with respect to product market in an anti-trust case that "a product market has been consistently held to include not only all products identical to the defendant's products, but also all products which are reasonably interchangeable with defendant's product, or which are reasonable substitutes for defendant's products"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) (stating that "the reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes"); *Murray Pub. Co., Inc. v. Malmquist*, 66 Wash.App. 318, 832 P.2d 493, 497–98 (1992); *General Business Syst. v. North American Philips Corp.*, 699 F.2d 965, 972 (9th Cir.1983). *See also Thurman Indus., Inc. v. Pay 'n Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir.1989).

that the Commission did not err in using reasonable interchangeability of use as the standard for determining the relevant product market.

### B. Competition from CLEC,[64] Wireless, and VoIP Providers

· ¶ 40 The Commission found that SBC faces effective competition when the services offered by CLEC, wireless, and VoIP providers are considered in the aggregate. Appellants contend that the evidence shows quite the opposite.

¶ 41 First, appellants argue that wireless and VoIP are not interchangeable with wireline telephony and should not even be taken into account in evaluating competition among telecommunications providers in Oklahoma. They point to testimony that the quality of service provided by wireless and VoIP is inferior to the quality of service provided by landline phones,[65] making the former poor substitutes for the latter. They also refer us to testimony that only a very small percentage of wireless subscribers have actually "cut the cord" on wireline service and that the percentage of VoIP substitution for wireline is negligible. This actual level of substitution, they contend, reflects public recognition that the services are not interchangeable and is a far more reliable indicator of public perception than opinion surveys. Witnesses appearing on behalf of the Commission Staff agreed with appellants that wireless and VoIP are not substitutes for landline phone service.

¶ 42 SBC presented evidence that wireless and VoIP should be considered in the same product market as wireline phones and that they are in fact competing successfully with SBC's intrastate retail services. SBC's expert witness testified that it is not necessary for services to be identical to be fit substitutes. We are told by SBC that wireless service is functionally equivalent to and a substitute for basic local exchange service because both modes of service enable users to make and receive calls in their homes and businesses. The witness testified that there are numerous providers of wireless service in Oklahoma and that thirteen wireless companies, many of which are large, national firms, have executed and filed interconnection agreements with SBC.[66] SBC presented testimony that three wireless providers have been granted ETC ("Eligible Telecommunications Carrier")[67] status by the Commission and must meet the same minimum service standards as wireline carriers. Furthermore, an SBC witness testified that all wireless providers have been ordered by the FCC to make enhanced 911 service available. SBC presented evidence that as of June 2004 the number of wireless subscribers in Oklahoma exceeded the total number of access lines attributable to SBC and certain other reporting independent Oklahoma telephone companies. SBC offered testimony about research findings indicating that the substitution of wireless for wireline phone service is increasing. With respect to usage substitution, an SBC witness testified that the percentage of all voice minutes being carried by

64. CLEC is the acronym for Competitive Local Exchange Carrier. CLEC is defined in OAC 165:55–1–4 as a telecommunications service provider that is certified by the Commission to provide local exchange services in an area or exchange within Oklahoma after July 1, 1995.

65. For both wireless and VoIP, a quality of service issue is lack of access to E911 services; for VoIP, additional quality of service issues include loss of service during power outages and the need for a broadband connection.

66. One of the wireless companies included in this testimony was SBC's affiliate, Cingular Wireless. Even so, that leaves twelve non-affiliated wireless competitors that have executed interconnection agreements with SBC.

67. An eligible telecommunications carrier is defined in OAC 165:55–1–4 as a telecommunica-

tions service provider as designated by the Commission pursuant to OAC 165:55–17–29 and 47 U.S.C. §§ 254 and 214(e). The provisions of OAC 165:55–17–29 require an eligible telecommunications service provider throughout its service territory to:

(1) Offer the telecommunications services that are supported by Federal universal service support mechanisms under 47 U.S.C. § 254(c), either using its own facilities or a combination of its own facilities and resale of another telecommunications service provider's services, including the services offered by another eligible telecommunications service provider; and,
(2) Advertise the availability of such telecommunications services and the charges therefor using media of general distribution.

# 167

wireless had tripled in the preceding three years. According to this expert, the more usage migrates to wireless networks, the more likely people will simply transfer their remaining usage to wireless. Finally, SBC presented two surveys, one of wireless subscribers and one of wireline customers, inquiring into the interviewees' usage of and attitudes toward various modes of telecommunications services. According to SBC's witness, these surveys show that the public increasingly views wireless service as an alternative to landline phones.

¶ 43 An SBC witness also testified that VoIP can be considered a substitute for landline service even though it does not provide identical features and technology. His surveys indicate that the public is aware of IP technology, a fraction have actually used VoIP at one time or another, and a healthy percentage of both wireless and wireline users have considered using VoIP. He testified that businesses are beginning to see certain advantages to using VoIP and that some have switched to it already. As with wireless, VoIP providers have been ordered by the FCC to provide access to enhanced 911 services.

¶ 44 In response to appellants' contention that actual substitution of wireless or VoIP for wireline service is rare, SBC's economics expert testified that if consumers perceive wireless and/or VoIP to be reasonable substitutes for wireline phones, that perception acts as a constraint on SBC's ability to raise prices on its services regardless of the extent to which wireless and VoIP are actually used as substitutes for wireline phones. This is so, says SBC's expert, because consumers can discontinue wireline service and migrate to wireless or VoIP service should wireline prices rise to an uncompetitive level.

 ¶ 45 We cannot recite here all of the evidence supporting and opposing the quality of substitutability of wireless and VoIP for wireline service. The question for us is whether there was substantial evidence to support the Commission's finding that wireless and VoIP are reasonably interchangeable for landline service. **We think there**

**was sufficient evidence presented to meet this standard.** SBC's economics expert witness testified that the ultimate determinant of whether products are substitutes, one for the other, and compete with one another is whether they have the ability, *actual or potential*, to take significant amounts of business away from one another. The record evidence is sufficient to support the Commission's conclusion that wireless and VoIP have that ability.

¶ 46 The Commission also found that SBC faces effective competition from competitive local exchange carriers or CLECs.[68] Cox points to the testimony it and AARP presented which is to the contrary, showing that SBC's share of the local exchange market is far greater than that of its largest CLEC competitor and that CLEC competition is likely to decline in the future due to regulatory changes and other circumstances. SBC presented testimony that market share is not decisive and that CLEC competition is growing, a trend SBC insists is not likely to be reversed despite the regulatory changes cited by appellants. Presented with this conflicting evidence about CLEC competition, the Commission gauged the evidence which was proffered by SBC to be the more persuasive. The Commission heard the testimony and observed the witnesses first-hand. **We will not second guess the Commission's judgment as to the weight and credibility of the evidence unless the weight of the evidence clearly supports a contrary conclusion. In this case, it does not and the Commission's determination must stand.**

¶ 47 With respect to the Commission's overall finding that CLECs, wireless and VoIP provide effective competition for SBC's services, it is important to keep in mind that the Commission did not pin its decision on a single competitive source, but rather found effective competition from a combination of other landline providers and intermodal competitors. To the extent that CLEC competition may not be as robust as SBC portrayed it, the Commission's decision to consider wireless and VoIP in the same product mar-

---

68. *See supra* note 64 where the acronym CLEC is defined.

ket as wireline service serves to compensate for a lower level of CLEC competition.

### C. Statewide Competition

¶ 48 Appellants argue that there is no evidence to support the Commission's finding that there is competition statewide that provides a competitive constraint on SBC's pricing. The evidence clearly shows that the extent of CLEC competition is greater in urban and suburban areas than it is in rural areas of Oklahoma and that wireless and VoIP substitution is limited. Here again, it is important to view the evidence as the Commission did in light of the theory of competition advanced by SBC's economics expert. **The question is not the extent of actual displacement of SBC's services by a competitor, but whether there are alternatives *available* statewide that provide a competitive constraint on SBC's pricing.** The evidence supports the Commission's finding that, viewed in the aggregate, CLEC, wireless, and VoIP providers are available statewide and their presence, regardless of current market share or strict identity of service quality, serves to constrain SBC's pricing.

### D. Market Power and Market Share

¶ 49 One of the factors set forth in Section 10.1 for the Commission to consider is market power. The pertinent provision states:

(b) In determining whether a service is competitive, factors the Commission will consider include, but are not limited to:

\* \* \* \* \*

(5) Other indicators of market power with respect to a service, which may include market share, growth in market share and whether the alternative provider(s) of comparable services are affiliated with the telecommunications service provider.

Appellants argue that the Commission wholly failed to take this factor into account. We disagree. The wording of this provision— "*other* indicators of market power"—carries with it the grammatical implication that one or more of the preceding four factors are also indicators of market power. That implication is borne out by the first three factors set out in Section 10.1, which are all features relevant to a market power analysis. While the Commission might have tracked the language in OAC 165:55–5–10.1 more closely, it is readily apparent upon reading the Order that the Commission made findings related to these factors. Additionally, the Commission's finding regarding affiliated providers of comparable services is specifically listed in Section 10.1 as a market power factor. **We hence reject appellants' contention that the Commission's Order ignores market power.**

 ¶ 50 Appellants also argue that the absence from the Order of any findings regarding *market share* constitutes a failure by the Commission to comply with the provisions of Section 10.1. We disagree. Section 10.1 does not *require* the Commission to consider market share. The rule treats market share as one of the "other" possible indicators of market power which the Commission *may,* but does not have to, address. The record provides a rationale for this omission. SBC's expert witness, an economist, testified at length as to the shortcomings of market share as a reliable indicator of market power. She testified that entry barriers are far more important than market share and said that market share is essentially irrelevant where there are no significant barriers to entry. She then proceeded to testify about the lack of entry barriers in Oklahoma's telecommunications market. SBC's expert further testified that market share is a particularly misleading indicator of market power in an industry such as telecommunications that has been highly regulated and was recently characterized by monopoly. Although Cox and AARP presented evidence of SBC's large market share and AARP's expert witness testified that significant entry barriers continue to exist in Oklahoma's telecommunications market, the Commission chose to accept the evidence in support of SBC's position and treat market share as irrelevant. The record contains substantial evidence to support this decision.

### E. Special Access Services

¶ 51 Appellants argue that there was no evidence presented to support the Commis-

sion's finding that special access service is faced with effective competition.[69] We disagree. One of SBC's witnesses testified at considerable length about the various competitors who offer special access services in competition with SBC. While it is true that the witness testified only that other companies *offer* special access service, not as to how successful any of them are in gaining customers, the Commission could have treated this testimony in a manner consistent with the general principle, noted earlier, that actual competition and market share are not important in constraining prices so long as there are alternatives to which customers can turn should SBC raise its prices. **We hold that the evidence was sufficient to support the Commission's finding.**

### F. Installation of DSL Technology[70] inn Rural Central Offices

¶ 52 In determining whether a telecommunications service is competitive and hence qualifies for Basket 4 pricing flexibility, Section 10.1 directs the Commission to consider and make findings related to the public interest.[71] Among the public interest findings made by the Commission in this cause is that increased pricing flexibility would provide an incentive to SBC and to its competitors to invest in communications infrastructure in Oklahoma. In a related finding, the Commission concluded that it would be in the public interest to require SBC, *as a condition of receiving relief,* to install high-speed technology in a number of rural Oklahoma communities. Specifically, the Commission ordered SBC to take the following steps:

1. Upgrade its facilities by installing a DSLAM,[72] or equivalent technology, in each of the 68 central offices served by

SBC Oklahoma that are not currently equipped for the provision of DSL service. . . .

2. Agree that when it completes the upgrade of a specific central office, it will ensure that all K–12 public schools and all hospitals within the serving area of that specific central office have access to DSL service or to broadband service, as defined in 17 O.S. 139.102(9), without restriction as to the specific technology used.

3. Make DSL service available to all customers within the technological service range of each rural DSLAM and not "redline" any area within such technological service range.

Appellants contend that the Commission lacks jurisdiction (or authority) to impose these requirements on SBC and that the Commission's conclusion that the requirements are in the public interest is not supported by substantial evidence. While this appeal was pending, SBC filed a motion asking the court to treat both aspects of this issue as moot based on the fact that as of 28 November 2006 the company had completed all the DSLAM upgrades. We now declare that the issue is moot insofar as appellants contest the Commission's authority to impose the DSL requirements on SBC and to that extent we grant SBC's motion.

¶ 53 Cox and AARP also argue that there is no evidence in the record supporting the installation of DSLAMs as a public interest factor. We disagree. While no evidence was proffered specifically regarding DSLAM technology, SBC presented expert testimony that pricing flexibility would be in the public interest because it would lead SBC to invest in improved technology.[73] AARP acknowl-

---

**69.** Special Access Service provides a dedicated, nonswitched transmission path between two fixed points.

**70.** DSL is the acronym for Digital Subscriber Line. DSL provides high-speed access to the Internet over traditional copper-wire telephone line. It permits subscribers to use the phone while connected to the Internet. *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.,* 92 F.Supp.2d 483, 487 (E.D.Va. 2000).

**71.** *See* the provisions of OAC 165:55–5–10.1, *infra* text at page 163.

**72.** DSLAM is the acronym for Digital Subscriber Line Access Multiplexer. It is a device that manages high-speed data transmission over existing telephone lines. It routes DSL traffic between the end-user's modem or other equipment and the network service provider's network.

**73.** SBC's expert economics witness said the following about the relationship between pricing flexibility and investment in infrastructure:

"Permitting an incumbent carrier [an ILEC such as SBC] flexibility to price its services encourages investment in new facilities, and competitive markets provide the incentive to

edges in its brief that the encouragement of high-speed internet services is "a worthy goal," and that access to high-speed internet services is "critical to promoting academic achievement," and "a valuable tool which allows businesses to work more efficiently and to better compete in today's marketplace."

¶ 54 SBC's willingness to install DSL technology in rural areas in conjunction with receiving pricing and tariffing flexibility supports the Commission's finding that increased pricing flexibility will lead to improvements in infrastructure. Requiring SBC to install improved technology in rural areas as a condition of receiving the relief requested was the Commission's way of demanding that SBC put its money where its mouth is, so to speak. Instead of waiting for market incentives to work, the Commission asked SBC to validate up front its experts' assertions about the positive relationship between pricing flexibility and improvements in infrastructure.

### G. Risk–Benefit Finding

¶ 55 Appellants next challenge the evidentiary support for the Commission's public-interest finding that the potential benefits of reclassification outweigh the risks. The record contains a great deal of testimony supporting the Commission's finding. SBC's expert witness testified repeatedly about the benefits of competition in general and specifically about the benefits to be expected from granting SBC pricing flexibility. Cox points to the equivocal testimony of a Commission

staff witness who said that granting SBC's application *could* be harmful to consumers and to competition. **Substantial evidence supports the Commission's finding that the benefits of granting SBC's application outweigh the risks**

### H. Deregulation.

¶ 56 As discussed earlier in this opinion, the provisions of Section 66(4)(B) set LRIC as the price floor for competitive services.[74] Because under the Order price revisions for SBC's reclassified services will become effective on the date they are delivered to the Director of the Public Utility Division,[75] appellants argue that the Commission has no way to enforce the LRIC price floor, effectively deregulating SBC contrary to the public interest.

¶ 57 The Commission found that the effect of granting SBC's application was not to deregulate the company. We agree. The pricing freedom the Order grants is precisely what Section 66(4)(C) contemplates and authorizes. The Commission found that the interest of the public is nevertheless protected because the Commission "retains jurisdiction to correct any competitive market failure that might result ..." and because SBC remains "subject to the Commission's ability to enforce compliance with its rules."[76] This is so in part because the rules permit the Commission to revoke the competitive designation of any service it determines is no longer competitive.[77] The Commission's de-

---

accelerate the deployment and development of advanced technologies."

74. *See supra* note 33 for the text of OAC 165:55–5–66(4)(B).

75. The provisions of OAC 165:55–5–66(4)(C) state:
"Price revisions to the tariffs for services in Basket 4 shall become effective on the date specified on the revised tariff sheets after the provider has delivered 3 copies of the revised tariff sheets to the Director of the Public Utility Division. The effective date shall be no earlier than the date the revised tariff pages are delivered."

76. The Commission found that granting SBC the relief requested does not constitute a "deregulation" of SBC. The Commission wrote:

"Under OAC 165:55–5–66(4), SBC Oklahoma must continue to file tariffs for these services. Furthermore, SBC Oklahoma's services must be priced above LRIC. Although SBC Oklahoma would not be required to provide LRIC studies before making a change in its tariffs, it would remain subject to the Commission's ability to enforce compliance with its rules."

77. OAC 165:55–5–10.1(g) states:
"Notwithstanding the provisions of this Section, the Commission may, at any time, revoke the competitive designation of a service, after notice and hearing, if the Commission determines that the service is no longer a competitive service. If the competitive designation of a service is revoked by the Commission, changes in the rates of the service or services affected shall be regulated pursuant to the provisions of OAC 165:55–5–10."

termination that the public interest is not threatened by giving SBC the ability to implement price revisions without prior regulatory supervision is a reasonable conclusion in light of the Commission's continuing ability to require price studies or revoke the competitive designation of any of SBC's services should it suspect anti-competitive behavior or predatory pricing.

### I. Pricing

¶ 58 Appellants next challenge the Commission's public interest finding regarding the pricing of SBC's reclassified services.[78] We have already determined that the Commission correctly interpreted its rule to permit competitive reclassification of regulated telecommunications services without first requiring LRIC cost studies. Having so interpreted its rule, the Commission found that it would be in the public interest to place SBC's reclassified services into Basket 4 at the lower of the LRIC of the service or its existing tariff price.[79] It came to this conclusion based on its finding that the prices of some services were set many years ago and were determined at that time to be just and reasonable. Implicitly finding that some, if not all, of the existing tariff prices are less than the LRIC of the services, the Commission found that it would not be in the public interest to require those prices to increase in order for the services to be placed in Basket 4.[80] Appellants challenge this finding because setting rates below cost can have an anti-competitive effect.

¶ 59 A price floor tied to the cost of supplying a service prevents a company from lowering prices below those which its competitors can meet and still remain in business. Once competitors have been eliminated, the surviving company's prices are no longer constrained by competition. Hence, below cost pricing is ordinarily not in the public interest in the long run even if in the short run the public is shielded from a price increase. That concern is obviated in this case because the Order reiterates the Commission's previous determinations that SBC's existing prices are just and reasonable. Having previously found that SBC's prices are neither anti-competitive nor predatory, the Commission's finding that it would not be in the public interest to raise those prices is justified.

### J. Transitional Limitation on Price Increases in Rural Areas

¶ 60 The Commission found that it would be in the public interest to impose a five-year transitional limitation period on price increases for basic residential access line service within the rural areas served by SBC.[81] This finding was based in part upon a related finding that rural ILECs in Oklahoma have had this type of pricing flexibility for many years and have not raised prices to an exorbitant level. The Commission also found that rural ILECs were investing in advanced communications services. Appellants argue that there was no evidence to support these findings. We disagree. SBC's economics expert testified as to the price of telephone service in rural areas and reported that rural ILECs were publicizing their investments in internet technology.

¶ 61 Appellants also challenge the Commission's finding that if the existing price of a

---

78. For the provisions of OAC 165:55–5–66(4)(B), see text at note 33.

79. The Order states:
 "The prices of some services—particularly basic residential access line service—were established by the Commission a number of years ago and were found to be just and reasonable at that time. The Commission finds that it would not be in the public interest to require that those prices be automatically increased in order for the services to be reclassified to Basket 4. The Commission finds that any service reclassified in this proceeding may be placed in Basket 4 with a pricing floor of LRIC or current tariffed price, whichever is lower."

80. Although there was no evidence presented establishing either the LRIC or the current price of any of SBC's services, none of the parties disputes that the existing tariff prices are lower than LRIC. Cox stated in one of its appellate briefs that the residential services under consideration "are undoubtedly priced below LRIC."

81. The Commission defined rural areas served by SBC as those exchanges classified within SBC's Rate Groups 1–3. The Order limits SBC's ability to increase prices in such exchanges to $2.00 per line per month, once within any twelve-month period.

rural service is less than the service's LRIC, the Commission will not interfere with a price increase even if, as the Order provides, 15% of SBC's subscribers statewide ask the Commission to do so. Appellants assert that this is simply another example of the Commission evading its obligations under the LRIC price standard. We disagree. Not only is this provision not an attempt to evade the LRIC price standard, but its effect is to prevent the public from using the Commission to bloc the gradual adjustment of rural prices toward their LRIC.

### K. Effect of LRIC Price Floor

¶ 62 The Commission found that the LRIC price floor applicable to Basket 4 services will prevent SBC from lowering prices to an anti-competitive level. Appellants argue that this finding is not supported by the evidence. As appellants correctly point out, there was no evidence whatsoever establishing the LRIC price floor for any of SBC's services. We must analyze this finding in light of the fact that the Commission knew it was placing SBC's services into Basket 4 at their existing prices, at least some of which are undoubtedly lower than their respective LRICs. We take the Commission's finding to mean no more than this: if SBC were to lower prices below the level at which they were placed into Basket 4, the Commission would have the authority to demand compliance with the LRIC price floor. Evidence of the current LRIC of SBC's services is not necessary in order to assert that the Commission has this authority.

## IX

## CONCLUSION

¶ 63 In this appeal from an Order of the Commission that reclassifies all but three of SBC's intrastate retail telecommunications services as competitive and gives SBC pricing and tariffing flexibility, our review of the record in its entirety reveals no reason to reverse the Commission's decision. The Commission correctly decided to treat this proceeding as legislative in nature and its

Order is supported by the law and substantial evidence.

¶ 64 **ORDER AFFIRMED**

¶ 65 WINCHESTER, C.J., EDMONDSON, V.C.J., and LAVENDER, HARGRAVE and OPALA, JJ., CONCUR.

¶ 66 KAUGER and WATT, JJ., CONCUR IN PART AND DISSENT IN PART.

¶ 67 COLBERT, J., DISSENTS.

¶ 68 TAYLOR, J., NOT PARTICIPATING.

KAUGER, J., with whom WATT, J. joins, concurring in part/dissenting in part:

¶ 1 I do not agree that the proceeding at issue is "more akin to legislation than to adjudication." Nearly 100 years ago, the United States Supreme Court in *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908) discussed the proceedings of the Virginia State Corporation Commission and its attempt to enforce orders fixing passenger rates. The Court noted that the corporation commission has been clothed with legislative, judicial, and executive powers.

¶ 2 The Court described a judicial inquiry as one that investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. In contrast, legislation looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The Court determined that the ratemaking involved in *Prentis* was a legislative proceeding and reviewed the proceeding as such.

¶ 3 The Court in *Southwestern Bell Telephone Co. v. Oklahoma Corp. Com'n,* 1994 OK 38, ¶ 9, 873 P.2d 1001, *cert. denied,* 513 U.S. 869, 115 S.Ct. 191, 130 L.Ed.2d 123 (1994) adopted the *Prentis* definition of legislative and judicial proceedings when we recognized that due process requirements for ratemaking decisions differ significantly from due process attached to judicial proceedings. The Court noted that when the Commission sits and decides matters in its adjudicative capacity, it exercises the power of a court of

record, but it determined that ratemaking is a legislative function.[1]

¶ 4 We have long recognized that the Commission itself, when exercising its adjudicative authority, is the functional analogue of a court of record with dispute resolution authority conferred by Constitutional grant.[2] In *Monson v. State ex. rel. Okla. Corp. Com'n,* 1983 OK 115, ¶¶ 4–5, 673 P.2d 839 we described the Corporation Commission's adjudicative powers as:

> While Art. 7 § 1, Okl. Const., creates courts and invests them with judicial power, the Corporation Commission stands established and governed by the provisions of Art. 9 §§ 15–34, Okl. Const. Within the limits of authority conferred on it by constitutional provisions as well as by statutory enactments, the Commission may exercise legislative, judicial and executive power. There can be absolutely no doubt of the Commission's legitimate claim to possession of adjudicative authority. When in individual proceedings it sits to hear and decide the issues before it, it acts, pursuant to Art. 9 § 19, Okl. Const., in the exercise of 'powers and authority of a court of record'. The role so constitutionally assigned to the Commission is entirely consistent both with Art. 4 § 1, Okl. Const., that provides for the separation of powers, as well as with Art. 7 § 1, Okl. Const., that vests judicial power in certain constitutionally-created or statutorily-established courts and tribunals.
>
> In some of our past decisions we did refer to the Commission's adjudicative

power as 'quasi-judicial'. We did this in order to distinguish it from pure judicial adjudication. The legal foundation for the Commission's dispute-settling function is different in character from that of other administrative agencies. The latter bodies derive their adjudicative authority not from a direct constitutional grant but rather from statutory delegation. The Commission's dispute-settling power clearly stands reposed in it by virtue of a direct constitutional mandate. Our fundamental law explicitly charges that body with the responsibility of a 'court of record'. In short, the Constitution's command is that, when acting in an adjudicative capacity, the Commission is to be treated as the functional analogue of a court of record. [citations omitted.]

¶ 5 The question becomes whether the reclassification sought here falls within the gamut of legislative ratemaking or requires a decision more akin to a judicial inquiry-one that investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. Rate regulation is prospective and future rates are set on the basis of forecasting of income, expenses, and profits; the focus of ratemaking is on whether the proposed rates are just and reasonable.[3]

¶ 6 This application is a request for reclassification of an Intrastate Retail Telecommunications Service as Basket 4 Services pursuant to Oklahoma Administrative Code 165:55–5–66(4) and 165:55–5–10.1.[4] Under

**1.** *Southwestern Bell Telephone Co. v. Oklahoma Corp. Com'n,* 1994 OK 38, ¶ 13, 873 P.2d 1001; *Wiley v. Oklahoma Natural Gas,* 1967 OK 152, ¶ 3, 429 P.2d 957.

**2.** *Southwestern Bell Telephone Co. v. Oklahoma Corp. Com'n.* see note 1, supra; *Van Horn Oil Co. v. Oklahoma Corp. Com'n,* 1988 OK 42 ¶ 12, 753 P.2d 1359.

**3.** *Turpen v. Oklahoma Corp. Com'n,* 1988 OK 126, ¶ 26, 769 P.2d 1309.

**4.** Oklahoma Administrative Code 165:55–5–66 involves Pricing and it provides in pertinent part:

The prices for services provided by an ILEC once the ILEC has implemented the Oklahoma Plan shall be determined according to the level of competition for each service. At the time of

election into the Plan, services will be priced according to the current existing tariff prices as approved by the Corporation Commission....
(4) Basket 4—Competitive Services.
(A) Services which are competitive, pursuant to OAC 165:55–5–10.1, and for which functionally equivalent and substitute services are available will be placed in Basket 4.
(B) The price floor for all services in this Basket will be the greater of the LRIC of the service under consideration or a price which is arrived at by applying imputation where appropriate.
(C) Price revisions to the tariffs for services in Basket 4 shall become effective on the date specified on the revised tariff sheets after the provider has delivered 3 copies of the revised tariff sheets to the Director of the Public Utility

these provisions of the code, a regulated telecommunications service can be reclassified as competitive which will allow pricing flexibility without having to seek the Commission's approval.

¶ 7 While the net effect of the re-classification may result in changes to the rates the company charges, the re-classification is not "ratemaking." A proceeding which merely involves rates or affects rates is not automatically "akin to legislation." For instance, in *Barker v. Bond,* 1941 OK 85, ¶ 0, 188 Okla. 559, 111 P.2d 507, the Court determined that, when in the course of a proceeding an adjustment of rates were impounded and refunded to patrons, the impounding and disbursing of the funds were judicial in nature. Similarly, in *St. Louis & S.F. Railroad Co. v. State of Oklahoma,* 1925 OK 541, ¶ 0, 116 Okla. 95, 244 P. 440, the Court noted that when a claim for a refund of an illegal transportation charge is based on an application of a wrong rate, the determination of whether a different rate from that charge is a legal rate is judicial not legislative.

¶ 8 What is relevant is the nature of what is being decided. Here, the re-classification does not seek to establish new rules, develop new rate structures or change the rates allowed under Basket 4. What it does seek is a determination based on the presented facts as to whether the telecommunications company has met the qualifications under the existing rules to transfer services to a Basket 4. In other words, has the company met the competitive requirements to be classified as

Division. The effective date shall be no earlier than the date the revised tariff pages are delivered.

The Oklahoma Administrative Code 165:55–5–10.1 provides:

(a) A telecommunications service provider may file an application to have the Commission determine that a regulated telecommunications service, other than local directory assistance or operator services is subject to effective competition and is therefore competitive for the applicant and/or the applicant class.

(b) In determining whether a service is competitive, factors the Commission will consider include, but are not limited to:

(1) The number and size of alternative providers of comparable services;

(2) The extent to which comparable services are available from alternative providers in the relevant market;

(3) The ability of alternative providers to make functionally equivalent or substitute services readily available at competitive rates and terms and conditions;

(4) Public interest considerations; and,

(5) Other indicators of market power with respect to a service, which may include market share, growth in market share and whether the alternative provider(s) of comparable services are affiliated with the telecommunications service provider.

(c) In considering these and other factors, the Commission is not required to give equal weight to each factor in subsection (b) of this Section, but has discretion to give more weight to a particular factor or factors, based on the evidence.

(d) As part of its order determining a service to be competitive, the Commission may require the passage of a transitional period, not to exceed two (2) years. During such transitional period, proposed tariff changes of all providers shall be deemed lawful and effective thirty (30) days after filing, unless the Commission suspends the proposed tariff change before the end of the 30–day period. If suspended, the provisions of OAC 165:55–5–13 shall apply.

(e) Following any transitional period ordered by the Commission pursuant to subsection (d) the rates charged by a TSP for a service determined to be competitive shall become effective on the date specified on the revised tariff sheets, after the provider has delivered three (3) copies of the revised tariff sheets to the Director of the Public Utility Division. The effective date shall be no earlier than the date the revised tariff pages are delivered to the Director of the Public Utility Division.

(f) Following any transitional period, ordered by the Commission pursuant to subsection (d), the terms and conditions under which competitive services are offered shall be submitted to the Director of the Public Utility Division and made available for public inspection. Changes in terms and conditions, and any combination of price and non-price components, shall be submitted at least thirty (30) days prior to when such changes shall be implemented by the provider.

(g) Notwithstanding the provisions of this Section, the Commission may, at any time, revoke the competitive designation of a service, after notice and hearing, if the Commission determines that the service is no longer a competitive service. If the competitive designation of a service is revoked by the Commission, changes in the rates of the service or services affected shall be regulated pursuant to the provisions of OAC 165:55–5–10.

(h) Any revised tariff for a service which has been determined to be competitive by the Commission, pursuant to this Section, shall identify the cause and order number making such designation of competitiveness.

competitive and therefore eligible for treatment under an existing, alternative rate structure?

¶ 9 The factors include, but are not limited to: 1) the number and size of alternative providers of comparable services; 2) the extent to which comparable services are available from alternative provides in the market; 3) the ability of alternative providers to make functionally equivalent services readily available at competitive rates, terms and conditions; 4) public interest considerations; and 5) other indicators of market power with respect to a service, which may include market share, growth in market share and whether the alternative providers of comparable services are affiliated with the telecommunications service provider.[5] The application of the facts to the five factors for the purpose of determining the existence of effective competition does not resemble rate-making. Consequently, it is "more akin to adjudication rather than legislation."

## CONCLUSION

¶ 10 The majority refuses to view the proceeding as judicial rather than legislative.

However, the Commission proceeded in an adjudicative capacity when it provided the explanation for waiving the five-year rule because "judicial economy would be best served." [6] When addressing the issue of the Commission's refusal to dismiss the application as premature, the majority approves the Commission's waiver of its rules under the guise that "the preservation of judicial resources constitutes good cause to waive the rule" and that strict adherence to the rule would be a "waste of judicial resources." Interestingly, the majority will not label the proceedings as judicial, but clings to the fact that the Commission acted in a judicial capacity to resolve the remainder of the issues.

¶ 11 As an adjudication which is judicial in character this proceeding is subject to the due process requirements of a judicial proceeding. When the Commission sits and decides matters in its adjudicative capacity, it exercises the power of a court of record pursuant to the Okla. Const. Art. 9, § 19 and the Commission should be treated as the "functional analogue of a court of record." [7] The majority opinion recognizes that some

5. Oklahoma Administrative Code 165:55–5–10.1, see note 4, supra.

6. Majority Opinion page 159.

7. *Southwestern Bell Telephone Co. v. Oklahoma Corp. Com'n,* see note 1, supra at ¶ 17. The Oklahoma Const. Art. 9, § 19 provides:

In all matters pertaining to the public visitation, regulation, or control of corporations, and within the jurisdiction of the Commission, it shall have the powers and authority of a court of record, to administer oaths, to compel the attendance of witnesses, and the production of papers, to punish for contempt any person guilty of disrespectful or disorderly conduct in the presence of the Commission while in session, and to enforce compliance with any of its lawful orders or requirements by adjudging, and by enforcing its own appropriate process, against the delinquent or offending party or company (after it shall have been first duly cited, proceeded against by due process of law before the Commission sitting as a court, and afforded opportunity to introduce evidence and to be heard, as well against the validity, justness, or reasonableness of the order or requirement alleged to have been violated, as against the liability of the company for the alleged violation), such fines or other penalties as may be prescribed or authorized by this Constitution or by law. The Commis-

sion may be vested with such additional powers, and charged with such other duties (not inconsistent with this Constitution) as may be prescribed by law, in connection with the visitation, regulation, or control of corporations, or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges in connection therewith, or with the assessment of the property of corporations, or the appraisement of their franchises, for taxation, or with the investigation of the subject of taxation generally. Any corporation failing or refusing to obey any valid order or requirement of the Commission, within reasonable time, not less than ten days, as shall be fixed in the order, may be fined by the Commission (proceeding by due process of law as aforesaid) such sum, not exceeding five hundred dollars, as the Commission may deem proper, or such sum, in excess of five hundred dollars, as may be prescribed or authorized by law; and each day's continuance of such failure or refusal, after due service upon such corporation of the order or requirement of the Commission, shall be a separate offense: Provided, That should the operation of such order or requirement be suspended, pending any appeal therefrom, the period of such suspension shall not be computed against the company in the matter of its liability to fines or penalties.

due process protections associated with a judicial proceeding such as notice and an opportunity to be heard, the right to present witnesses, and the right to cross examine were afforded the parties. Nevertheless, the majority stops short of a full review of due process and whether any irregularities may have resulted in its deprivation. I would not do so.