OKLAHOMA GAS AND ELECTRIC CO. v. STATE ex rel. OKLAHOMA CORP. COMMISSION
2025 OK 15
Case Number: 118857
Decided: 03/04/2025
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2025 OK 15, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

OKLAHOMA GAS AND ELECTRIC COMPANY, Appellant,
v.
STATE OF OKLAHOMA EX REL. OKLAHOMA CORPORATION COMMISSION, and PEOPLE'S ELECTRIC COOPERATIVE, Appellees,
and
OKLAHOMA ASSOCIATION OF ELECTRIC COOPERATIVES, Intervenor.

APPEAL FROM OKLAHOMA CORPORATION COMMISSION,
CAUSE NO. PUD 201900026, ORDER NO. 711782

¶0 In the spring of 2018, People's Electric Cooperative, Inc., (People's) and Oklahoma Gas and Electric Company (OG&E) submitted competing bids to provide retail electric service to the Tall Oak Woodford Cryo Plant (Tall Oak or Plant) in Coal County, Oklahoma. The Plant is located in the certified territory of People's, which has exclusive rights to provide electricity to customers in the area pursuant to the Retail Electric Supplier Certified Territory Act (RESCTA). OG&E's successful proposal relied on the Large Load exception to RESCTA, which permits a supplier "extending its service" into another supplier's certified territory for qualifying large-load customers. To provide service to the Plant, OG&E did not extend its own retail distribution lines, but tapped into third-party transmission facilities. Upon People's application, the Oklahoma Corporation Commission enjoined OG&E from serving the Plant, finding that OG&E was not "extending its service" in a manner authorized by RESCTA. We retained OG&E's appeal. We hold that Article 9, Section 20 of the Oklahoma Constitution requires a limited review of the Commission's order, and we affirm the Commission's determination that a retail electric supplier may not use third-party transmission lines to extend its service into another supplier's certified territory under the Large Load exception of RESCTA.

AFFIRMED

Clyde A. Muchmore and Melanie Wilson Rughani, Crowe & Dunlevy, PC, Oklahoma City, Oklahoma, for Appellant Oklahoma Gas and Electric Company.

William L. Humes, Oklahoma Gas and Electric Company, Oklahoma City, Oklahoma, for Appellant Oklahoma Gas and Electric Company.

Patricia L. Franz and Daniel P. Boyle, Oklahoma Corporation Commission, Oklahoma City, Oklahoma, for Appellee Oklahoma Corporation Commission.

Pete G. Serrata III, Derryberry & Naifeh, LLP, Oklahoma City, Oklahoma, for Appellee People's Electric Cooperative, Inc.

Adam J. Singer and J. Eric Turner, Derryberry & Naifeh, LLP, Oklahoma City, Oklahoma, for Oklahoma Association of Electric Cooperatives.

OPINION

DARBY, J.

¶1 This case involves an order of the Oklahoma Corporation Commission (Commission) that enjoined Oklahoma Gas & Electric Company (OG&E) from providing retail electric service to a rural customer. The pivotal question before us is whether the Corporation Commission's decision interpreting the "Large Load" exception to the Retail Electric Supplier Certified Territory Act (RESCTA or the Act), 17 O.S. 2011, § 158.25et seq. is sustained by law and substantial evidence. We answer this question in the affirmative. Also at issue is what appellate standard of review does the Oklahoma Constitution demand. Article 9, Section 20 of the Oklahoma Constitution requires this Court's review extend no further than to determine whether the Corporation Commission has regularly pursued its authority, and whether the Commission's findings of fact and conclusions of law are sustained by the law and substantial evidence. We uphold the Commission's determination which restricted and enjoined OG&E from using third-party transmission lines to extend its service under the "Large Load" exception of the Act.

BACKGROUND AND PROCEDURAL HISTORY

A. The People's Case

¶2 The present case concerns People's Electric Cooperative, Inc., (People's) and OG&E competing to provide retail electric service to the Tall Oak Woodford Cryo Plant (Tall Oak or Plant) in Coal County, Oklahoma. The pertinent facts are not disputed and were stipulated by the parties in their filings with the Commission. Stipulated Facts, Oct. 18, 2019; Rec. at 144.

¶3 For purposes of RESCTA, the Plant is located in an unincorporated area within People's certified territory. Another supplier is not permitted to provide retail electric service to customers in People's certified territory unless an exception under RESCTA is applicable. 17 O.S. 2011, § 158.2517 O.S. 2011, § 158.25

¶4 In the spring of 2018, both People's and OG&E submitted proposals to provide retail electric service to the Plant. Tall Oak selected OG&E, and a contract for service was executed on June 28, 2018. At the time, OG&E did not have any retail distribution lines

¶5 To provide service to the Plant, People's would have simply tapped into its existing distribution line which runs a short distance of approximately 0.9 miles south of the primary meter location provided by OG&E for the Plant, at a total minimal project cost of approximately $193,500. To serve the Plant with distribution facilities extended from its own certified territory, OG&E would have needed to construct approximately 25 miles of distribution facilities along roadways to reach the Plant.

¶6 OG&E began engineering work on the design of the project and commenced construction on December 10, 2018. OG&E completed construction of its facilities on April 28, 2019, and thereafter began providing retail electric service to the Plant. Construction on the Plant was also completed in April of 2019, and OG&E is currently furnishing retail electric service to the Plant.

¶7 On April 19, 2019, only nine (9) days prior to OG&E completing construction of its facility, People's filed an Application with the Commission seeking an order enjoining and restraining OG&E from serving, furnishing, making available, rendering, or extending retail electric service to the Plant. People's asserted that by utilizing the third-party WFEC transmission facilities, OG&E was not extending its retail service as required by RESCTA. On June 20, 2019, the Oklahoma Association of Electric Cooperatives (OAEC) filed its entry of appearance and intervention in the lower case and has also filed an entry of appearance and brief in this appeal.

 

¶8 The case proceeded to a hearing on the merits before the Administrative Law Judge (ALJ) on January 23, 2020. The ALJ initially concluded that the Act did not prohibit OG&E from serving the Plant by connection with a third-party transmission line. But, the ALJ further acknowledged that the Commission had recently issued its order in CKenergy 1 enjoining OG&E from providing retail electric service under similar circumstances. Based upon the Commission's order in CKenergy 1, the ALJ ultimately recommended that OG&E was not lawfully extending service under the Large Load exception, and that People's request for injunctive relief should be granted. The Commission followed the ALJ's recommendation, and its final order dated May 26, 2020, states in part:

THE COMMISSION FURTHER FINDS that OG&E did not "extend" its retail distribution system to serve the Tall Oak Plant. Rather, OG&E accessed third-party transmission facilities to serve the Tall Oak Plant. Therefore, the RESCTA prohibits OG&E from serving the Tall Oak Plant in the manner it is being served.

THE COMMISSION FURTHER FINDS that PEC's [People's] application should be granted and OG&E should be enjoined from serving or furnishing retail electric service to the Tall Oak Plant directly from third-party transmission facilities in violation of the RESCTA.

Final Ord. of the Okla. Corp. Comm'n, May 26, 2020, by Comm'rs Hiett & Murphy, Comm'r Anthony not participating; Rec. at 342. The Commission entered a stay of its order which has allowed OG&E to continue providing service to the plant. From this decision by the Commission, OG&E brings the present appeal.

¶9 Two issues are before us here -- 1) whether the Commission correctly determined that RESCTA's Large Load exception prohibits a supplier from using third-party transmission lines to "extend" its retail electric service, and 2) if the Court upholds the Commission's decision, whether this interpretation of the Large Load exception should apply prospectively only, so as not to impact the Plant and other similarly situated customers who are currently supplied with electricity by OG&E.

B. The CKenergy 1 Case

¶10 The present case requires us to revisit our recent decision in Oklahoma Gas & Electric Co. v. Okla. Corp. Comm'n, [hereinafter CKenergy 1], 2023 OK 33535 P.3d 1218CKenergy 1, we reviewed a comparable determination by the Commission interpreting the Large Load exception in 17 O.S. 2011, § 158.25

¶11 On April 4, 2023, this Court issued an opinion in CKenergy 1 and determined that the Commission erred in its statutory interpretation. CKenergy 1, 2023 OK 33Id.

¶12 In his dissent, Chief Justice Kane contended that the Commission correctly interpreted the statute. He agreed with the Commission's conclusion that RESCTA was "not designed to allow large outside utilities to 'cherry pick' electrical loads by the use of third party transmission lines located in certified territories." Id. at ¶ 2, 535 P.3d at 1230 (Kane, C.J., dissenting). Chief Justice Kane cautioned that the majority's statutory construction "creates an exception not foreseen by the legislature, and which will serve to burden the same rural community electric suppliers that the RESCTA sought to protect." Id. at ¶ 3, 535 P.3d at 1231 (Kane, C.J., dissenting).

¶13 In his separate dissent, Justice Darby cautioned against nullifying the protections of the Act by "allowing any retail electric supplier to tap into another's distribution lines or infrastructure to reach into another retail electric supplier's certified territory." Id. at ¶ 10, 535 P.3d at 1234 (Darby, J., dissenting).

STANDARD OF REVIEW

¶14 This Court's review of Commission decisions is governed by the Oklahoma Constitution, Article 9, Section 20, which provides in pertinent part:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.

Okla. Const. art. IX, § 20 (emphasis added). Section 20 provides two standards of review. The first applies to orders involving violations of constitutional rights. Cases in this category receive our independent, or de novo review.

¶15 No party in this case asserts a constitutional violation on appeal. The only argument involving a constitutional issue occurred in OG&E's motion to dismiss filed below. There, OG&E claimed that the Commission's interpretation of the Large Load exception was essentially an amendment of the statute which could not be applied retroactively without violating Article 2, Section 15 of the Oklahoma Constitution.

¶16 The Commission denied OG&E's motion to dismiss, and OG&E did not further pursue any constitutional claim before the Commission. Nor did it allege any constitutional violation, or otherwise reference Oklahoma Constitution, Article 2, Section 15, in its filings with this Court. Claims of error for which there is no support in argument and authority are deemed abandoned. In re Initiative Petition No. 426, State Question No. 810, 2020 OK 43465 P.3d 1244Hadnot v. Shaw, 1992 OK 21826 P.2d 978Fent v. Contingency Review Bd., 2007 OK 27163 P.3d 512Cox Okla. Telecom, LLC, v. Okla. Corp. Comm'n, 2007 OK 55164 P.3d 150

¶17 The second standard of review applies to all other appeals from Commission orders. These cases receive a limited de novo review which extends no further than determining whether the Commission acted within its authority and whether its findings and conclusions are sustained by the law and substantial evidence. Pub. Serv. Co. v. Okla. Corp. Comm'n, 2005 OK 47115 P.3d 861CKenergy 1 regarding the standard of review requires clarification.

¶18 A closer review of the cases cited in CKenergy 1 is enlightening. First, in CKenergy 1, we cited Western Heights, which was an appeal from the district court, not the Commission. CKenergy 1, 2023 OK 33Western Heights Indep. Sch. Dist. No. I-41 of Okla. County v. State ex rel. Okla. Dep't of Educ., 2022 OK 79518 P.3d 531Western Heights was not a Commission case, the Court did not consider the constitutionally mandated standard of review. Okla. Const., art. IX, § 20. Reliance on Western Heights and the cases cited there, in the context of a Commission appeal, is misplaced.CKenergy 1 and the present case.

¶19 Second, in CKEnergy 1 we also cited Medicine Park Tel. Co. v. Okla. Corp. Comm'n, 2019 OK 21441 P.3d 113Dobson Tel. Co. v. Okla. Corp. Comm'n, 2019 OK 27441 P.3d 147Medicine Park and Dobson, however, and the cases cited therein are also inapplicable. Medicine Park and Dobson contain nearly identical language regarding the standard of review:

The issue in this appeal concerns the Commission's legal interpretation of the OUSF statute and the alleged arbitrary and capricious denial of funding in violation of the Oklahoma Constitution. Constitutional implications as well as statutory interpretation require us to review this case de novo. Cox Oklahoma Telecom, LLC v. State ex rel. Oklahoma Corp. Comm'n, 2007 OK 55164 P.3d 150

Medicine Park, 2019 OK 21441 P.3d 113Medicine Park and Dobson involved allegations that the Commission's determination resulted in constitutional violations. Accordingly, the appellate review of the Commission's statutory interpretation properly fell into the independent review required under the Oklahoma Constitution. Okla. Const. art. IX, § 20. Both opinions, however, are silent regarding the Constitution's provision concerning review otherwise afforded to all other appeals from Commission orders.Medicine Park and Dobson may be appropriate for Commission appeals involving constitutional issues, such analysis is not suitable precedent for CKenergy I or the present case.

¶20 Medicine Park and Dobson properly relied upon Cox Oklahoma Telecom, LLC v. Okla. Corp. Comm'n, 2007 OK 55164 P.3d 150Cox, we specifically recognized both standards of review, and our division of the analysis into two separate categories is instructive:

We review de novo the Commission's decision to treat this proceeding as legislative rather than judicial because a constitutional question is implicated. All other issues in this appeal are reviewed under the more deferential standard of review.

Cox, 2007 OK 55164 P.3d 150

¶21 But the term in Cox "more deferential" is not accurate. To begin with, the independent review of Commission decisions which involve a constitutional question is not deferential to any degree. It is, therefore, incorrect to label the limited review analysis applicable to "all other cases" as "more deferential." This Court is under no constitutional edict to yield our duty as the court of last resort in the judicial branch in Oklahoma for all matters civil to determine on review what the law is, what the law means, and how the law applies. See, e.g., City of Oklahoma City v. Oklahoma Corp. Comm'n, 2024 OK 77

¶22 The "other issues" in Cox included the Commission's refusal to dismiss an application as premature, its interpretation of regulations applicable to telecommunications services, and numerous challenges regarding the evidentiary support for the Commission's findings. We upheld the Commission's determinations on those nonconstitutional issues, concluding that its order was supported by the law and substantial evidence. Id. at ¶ 63, 164 P.3d at 172.

¶23 We understand the Oklahoma Constitution to require that we give some regard to the Commission's finding of fact and conclusions of law. We decide what the law is, after considering the Commission's conclusions. While Commission findings or conclusions do not constitute precedent to which we must necessarily defer, or presume correct, we must at least consider the Commission's decision in order to conclusively determine if the order is sustained by law and substantial evidence.

¶24 We now further clarify what it means for a Commission order to be "sustained by law." When the Commission ignores the plain language of a statute, or attempts to impose a meaning which is not supported by any recognized rule of statutory interpretation, the Commission's conclusion may be categorized as one which is not sustained by the law. Such an order is subject to reversal in line with the Oklahoma Constitution. Okla. Const. art. IX, § 20.

ANALYSIS

A. The Retail Electric Suppliers Certified Territories Act

¶25 We begin our de novo review by taking a fresh look at the Act itself. The Legislature enacted RESCTA in 1971, in an effort to establish a coordinated system for providing electric service to customers in rural areas. The general approach and stated purposes of the Act are as follows:

It is hereby declared to be in the public interest that, in order to encourage the orderly development of coordinated statewide retail electric service, to avoid wasteful duplication of distribution facilities, to avoid unnecessary encumbering of the landscape of the State of Oklahoma, to prevent the waste of materials and natural resources, for the public convenience and necessity and to minimize disputes between retail electric suppliers which may result in inconvenience, diminished efficiency and higher costs in serving the consumer, the state be divided into geographical areas, establishing the unincorporated areas within which each retail electric supplier is to provide the retail electric service as provided in this act.

17 O.S. 2011, § 158.23

¶26 Under the Act, each rural electric supplier is assigned a geographic territory in which it has the exclusive right to provide retail service to customers:

Except as otherwise provided herein, each retail electric supplier shall have the exclusive right to furnish retail electric service to all electric-consuming facilities located within its certified territory, and shall not furnish, make available, render or extend its retail electric service to a consumer for use in electric-consuming facilities located within the certified territory of another retail electric supplier; provided that any retail electric supplier may extend its facilities through the certified territory of another retail electric supplier, if such extension is necessary for such supplier to connect any of its facilities or to serve its consumers within its own certified territory.

17 O.S. 2011, § 158.25

¶27 Unless an exception under RESCTA applies, "no retail electric supplier shall furnish retail electric service in the certified territory of another retail electric supplier." 17 O.S. 2011, § 158.2417 O.S. 2011, § 158.25

The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

17 O.S. 2011, § 158.25

¶28 The Act does not define the term "extending its service" and provides no explicit guidance regarding the manner or method by which a foreign retail electric supplier may "extend" its service into a different supplier's certified territory. The issue before us involves the Corporation Commission's decision that a supplier may not tap into third-party transmission lines in order to "extend" retail service under the Large Load exception.

¶29 In Keating v. Edmondson, 2001 OK 110

A cardinal precept of statutory construction is that where a statute's language is plain and unambiguous, and the meaning clear and unmistakable, no justification exists for the use of interpretative devices to fabricate a different meaning.

Id. at ¶ 15, 39 P.3d at 888. The plain statutory language must be used to give effect to the legislative intent expressed in the statute. Amer. Airlines, Inc. v. Oklahoma Tax Comm'n, 2014 OK 95341 P.3d 56Naylor v. Petuskey, 1992 OK 88834 P.2d 439Amer. Airlines, 2014 OK 95Brown v. Claims Mgmt. Res. Inc., 2017 OK 13391 P.3d 111Wylie v. Chesser, 2007 OK 81173 P.3d 64

¶30 If the language in the statute is ambiguous, and the rules of statutory construction are applicable, we cannot interpret the statute in such a way other than how the words are used in the ordinary and usual parlance and the provisions of the statute must be construed based on the common definitions of the words used. Riffe Petroleum Co. v. Great Nat. Corp., 1980 OK 112614 P.2d 576Pub. Serv. Co. of Okla. v. State, 1982 OK 6645 P.2d 465Amer. Airlines, 2014 OK 95

¶31 Following these stated principals, the Commission reached its conclusion that OG&E was not "extending its service" as contemplated by the Large Load exception. We must overturn this determination if it is not sustained by the law.

B. The Plain Language of RESCTA

¶32 Here, as in CKenergy 1, we first consider the ordinary definition of the words used in the phrase "extending its service." In CKenergy 1, we noted that "extend" has several meanings, including: to spread or stretch forth; to proffer; to make available; or to advance. CKenergy 1, 2023 OK 33Id. at ¶ 17, 535 P.3d at 1225-1226.

¶33 There is, however, an opposing and equally valid interpretation of the plain meaning of this language. "Extend" has several common definitions with specific meanings, including: "to spread or stretch forth," "to stretch out to fullest length," "to cause to reach," "to cause to be longer," and "to stretch out in distance, space, or time." Merriam-Webster, https://www.merriam-webster.com/dictionary/extend (last visited April 15, 2024).

¶34 If we only consider the dictionary definitions of the term "extend," we must question whether the language of the statute is clear and unambiguous. But, setting dictionary definitions aside, the plain statutory language must be used to give effect to the legislative intent expressed in the statute. Rather than limit our consideration to one word or phrase, we must also consider the various provisions of the legislative scheme to ascertain the legislative intent. Amer. Airlines, 2014 OK 95341 P.3d 56

¶35 Our analysis must also consider the meaning of the term "service" as used in the Large Load exception's reference to a supplier "extending its service." Here, we are reviewing one of the two instances in which that term appears alone in the statute, without the word "retail." The entire focus of the Act, however, is retail electric service. The Act is known as the Retail Electric Supplier Certified Territory Act. 17 O.S. 2011, § 158.21

The term "retail electric supplier" means any person, firm, corporation, association or cooperative corporation, exclusive of municipal corporations or beneficial trusts thereof, engaged in the furnishing of retail electric service.

. . .

The term "retail electric service" means electric service furnished to a consumer for ultimate consumption, but does not include wholesale electric energy furnished by an electric supplier to another electric supplier for resale.

17 O.S. 2011, §§ 158.22

¶36 As Justice Darby pointed out in his dissent in CKenergy 1, "using the last-antecedent canon, one that is essentially a rule of grammar, we find that in both instances [where 'service' is used alone] that 'retail electric service' is the antecedent of the legalistic pronoun such, § 158.25(D), and the possessive determiner (type of pronoun) its, § 158.25(E)."such" and "its" refer to the earlier antecedents "retail electric service" and "retail electric supplier," respectively. To wit,

D. Except as provided in Section 5 C, no retail electric supplier shall furnish, make available, render or extend retail electric service to any electric-consuming facility to which such service is being lawfully furnished by another retail electric supplier on the effective date of this act, or to which retail electric service is lawfully commenced thereafter in accordance with this section by another retail electric supplier.

E. The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

17 O.S. 2011, §§ 158.25

¶37 It is not unreasonable to conclude that the plain meaning of "extending its service" 1) is the lengthening of OG&E's existing retail facilities, and 2) is not the same thing as simply furnishing, providing, or offering electricity. This interpretation incorporates the definitions which are provided in the Act and follows recognized rules of grammar. Plus, for the term which is not specifically defined in the Act -- "extending" -- this interpretation uses a common and ordinary meaning.

¶38 In addition, looking at the whole of Section 158.25, the Commission's interpretation makes sense textually. In granting exclusivity to each supplier in its own certified territory, the Act requires that each provider "shall not furnish, make available, render or extend its retail electric service... within the certified territory of another retail electric supplier." 17 O.S. 2011, § 158.25furnish, make available, render or extend retail electric service to any electric-consuming facility to which such service is being lawfully furnished by another retail electric supplier . . . ." 17 O.S. 2011, § 158.25

¶39 The next sub-section in Section 158.25 -- paragraph E -- contains the Large Load exception. It permits a provider's "extending its service" in an unincorporated area 1) to its own property and facilities, and 2) to a new large-load customer. 17 O.S. 2011, § 158.25

¶40 In addition, "furnish" or "furnished" appears alone six other times in Section 158.25, all in the more general context of "providing" retail electric service. The Legislature, however, chose not to follow this pattern -- using "furnish" to mean "provide" -- in the Large Load exception in paragraph E. Rather than simply stating that "the Act shall not preclude any retail supplier from "furnishing retail electric service ..." the Legislature instead chose only the more specific term "extending its service." 

 

¶41 While we were persuaded otherwise in CKenergy 1, we now acknowledge that the Legislature purposefully isolated the phrase "extending its service" and omitted the other terms in order to eliminate the other options. Therefore, we now hold that the Commission's conclusion in CKenergy 1 was a permissible determination and a conclusion sustained by the law and substantial evidence.

C. The Commission's Determination Was Consistent with Recognized Rules of Statutory Interpretation and the Goals of RESCTA

¶42 This Court has long emphasized the importance of construing a statute consistent with the legislative intent, in a manner that considers the general scope and meaning of the entire act. In Lancaster v. State, 1967 OK 84426 P.2d 714

The general rules that apply in construing a statute are that the legislative intent must govern, and to arrive at the legislative intent, the entire act must be considered; a construction should be given the act which is reasonable and sensible, and should not be construed so that it would lead to an inconsistency between different parts as they bear upon each other.

Lancaster, 1967 OK 84

¶43 The Legislature expressly articulated the public interest goals to be achieved by RESCTA and the regulatory manner in which those priorities are to be accomplished. The first goal is to "encourage the orderly development of coordinated statewide retail electric service." 17 O.S. 2011 § 158.23Id.

¶44 OG&E argues that the Large Load exception in Section 158.25(E) is unqualified and contains no restrictions on the mechanism or manner in which a supplier may "extend its service" into the certified territory of another service provider. Under this view, the Large Load exception does not prohibit a service provider from using third-party transmission lines to provide retail service to a location deep within the exclusive certified territory of another provider. OG&E argues that this approach furthers legislative intent because it eliminates the need for the provider to build costly and duplicative new distribution facilities to reach the location, thereby encumbering the landscape, and adding costs to consumers. Obviously, this is not an unreasonable conclusion, as this Court adopted this interpretation in CKenergy 1.

¶45 We are, however, also persuaded by People's argument that tapping into a third party's transmission line and hopscotching into another supplier's certified territory is in direct conflict with the purposes of RESCTA. OG&E's newly built facilities are not part of, connected to, or contiguous with any existing OG&E retail electric service facilities. If "extending its service" has no restriction, and can be accomplished in any manner or method, then OG&E's approach of utilizing WFEC's transmission lines to provide retail electric service could be done anywhere within any other retail electric provider's exclusive certified territory if the other Large Load requirements are satisfied. Such an unconstrained approach would permit OG&E, or any other provider -- including providers from other states -- to build pockets of new retail electric service miles from any existing OG&E facilities. This practice opens up large loads to unlimited "cherry picking" competition, unfettered by the regulatory scheme of RESCTA.

¶46 We acknowledge that the parties' respective arguments each contain logical and convincing points. This Court itself is of two minds regarding the correct interpretation, as evidenced by our analysis in CKenergy 1. The obvious problem here is that the Act's definitional scheme and stated purposes do not precisely address the conduct under scrutiny.

¶47 RESCTA grants supervisory authority to the Commission with regard to ensuring compliance with the provisions of the Act. See 17 O.S. 2011, § 158.27

The Certified Territory Act confers upon the Commission supervisory power to carry out and effectuate the purposes of the Act. The Commission has the responsibility to safeguard against unnecessary duplication of distribution facilities and encumbering of the landscape, to prevent the waste of materials and natural resources, and to minimize costs to consumers.

Pub. Serv. Co. of Okla. v. Okla. Corp. Comm'n, 1992 OK 153842 P.2d 750

¶48 The Act, as a whole, is clearly anticompetitive and it protects each rural provider in its exclusive certified territory by ensuring that each supplier has a monopoly in its respective market. Under this framework, the Commission determined that the Large Load exception was not unlimited and does not permit OG&E to use third-party transmission lines to provide service to the Plant over the objection of the resident provider.

¶49 We cannot say that the Commission has failed to consider the provisions of RESCTA as a whole. Nor does the Commission's conclusion contradict the Act's stated goals of orderly development of coordinated statewide retail electric service and reducing needless duplication of facilities. To the contrary, a broader, more permissive interpretation of the Large Load exception is inherently at odds with the anticompetitive nature of the Act, and would extinguish primary protections afforded the local producers in their certified territories. The Commission's determination that such a result is inconsistent with the Act's regulatory scheme and purpose is sustained by law and substantial evidence.

¶50 The Commission's determination is also consistent with the Legislature's directive for liberal construction of RESCTA. Section 158.31 of the Act states:

This act shall be construed liberally. The enumeration of any object, purpose, power, manner, method or thing shall not be deemed to exclude like or similar objects, purposes, powers, manners, methods or things.

17 O.S. 2011, § 158.31

¶51 The Commission interpreted the Large Load exception in a manner which best preserves the Act's protections for rural suppliers in their own certified territories. When the Legislature has mandated liberal construction of an act, any exception is usually narrowly construed in order to achieve the primary purpose. See Maracich v. Spears, 570 U.S. 48, 60, 133 S. Ct. 2191, 2200, 186 L. Ed. 2d 275 (2013) ("An exception to a 'general statement of policy' is 'usually read ... narrowly in order to preserve the primary operation of the provision'") (citations omitted). As Chief Justice Kane pointed out in his dissent in CKenergy 1, the statutory construction permitting OG&E to use third-party transmission lines "creates an exception not foreseen by the legislature, and which will serve to burden the same rural community electric suppliers that the RESCTA sought to protect." CKenergy 1, 2023 OK 33

¶52 Liberal construction requires protection of the rural electric supplier, and narrow application of the exception. The Act mandates each respective retail electric supplier to serve every customer in its territory, including the remote, very small, and unprofitable. The Act balances this burden by granting the retail electric supplier an otherwise impermissible monopoly as the only supplier in the territory. To effectively deny the supplier the opportunity to serve the more profitable Large Load customer located within its territory violates the built-in equities of the Act.

D. The Commission's Interpretation Is an Issue of First Impression 

¶53 OG&E claims that, for decades, suppliers have had a well-known common practice of tapping into third-party transmission lines to extend service under the Large Load exception, with the knowledge and approval of the Commission. In support of this contention, OG&E points to a 1987 Commission decision involving retail service to a new large Solo Cup facility.new separate facility, or part of an existing plant, which would determine whether it qualified as an "electric consuming facility" covered by the Large Load exception of Section 158.25(E). Rec. at 236. The Solo Cup case did not involve any argument or decision related to a supplier "extending its service" using third-party transmission lines under the Large Load exception.

¶54 People's denies the existence of any well-known common practice or longstanding agency policy permitting retail suppliers to extend their service into another provider's certified territory using third-party transmission facilities. Instead, People's maintains that the rural providers were not aware of such a practice until the recent occurrences which gave rise to the group of cases now on appeal. People's points out that, as soon as this practice became known, CKenergy filed its challenge in the companion case and the Commission granted an injunction against OG&E preventing it from "extending its service" using this method.

¶55 In the present case, OG&E points to Branch Trucking Company v. Oklahoma Tax Commission, 1990 OK 41801 P.2d 686Branch Trucking, the Oklahoma Tax Commission adopted a new regulation requiring, for the first time, that rural electric cooperatives must collect sales taxes on the sale of electricity. The cooperatives argued that the new regulation was an improper reversal of the Tax Commission's longstanding administrative interpretation exempting them from collection of sales tax. This Court agreed, stating as follows:

Regardless of whether this is viewed as an interpretation of the [Rural Electric Cooperative] Act, in that rural cooperative consumers were exempt from paying such a tax, or an interpretation by default, because the cooperatives were not required to collect the tax, the end result is a settled policy that cannot now be reversed absent legislative action or a cogent reason by the Tax Commission justifying its actions.

Branch Trucking, 1990 OK 41

¶56 In Branch Trucking, the Tax Commission undeniably had a longstanding, settled policy of exempting rural cooperatives from collecting sales tax on the sale of electricity. The Court noted that this issue had been discussed since at least the 1940's and there was no question that the industry players had long relied on the established approach. Accordingly, we found that the Tax Commission could not reverse its position without cogent reasons, or legislative action. Branch Trucking, 1990 OK 41.

¶57 Such an outcome makes sense when an agency seeks to change an established rule which has been recognized and relied upon in the industry. In the present case, however, this is an issue of first impression, which neither the Commission nor the courts have expressly addressed before CKenergy I. The record here does not clearly establish that the Commission had either a longstanding rule or a well-known de facto policy of permitting the disputed conduct. If we were to apply Branch Trucking, this Court would be allowed to intervene only if the Commission is attempting to reverse a longstanding, firmly entrenched position without adequate justification. Branch Trucking would not authorize us to override the Commission's determination here.

¶58 To the extent our discussion in CKenergy 1 implies otherwise, we expressly reject the proposition that the prior existence of transmission taps in another provider's certified territory equates to endorsement, acceptance or acquiescence by the Commission, or otherwise serves as a reason to hold as we did in CKenergy 1. As in the present case, the CKenergy 1 parties disputed that this was a common industry practice. See CKenergy 1, 2023 OK 33See CKenergy's Response and Objection to OG&E's Notice of Appeal and Request for Suspension, April 26, 2019; Record at 1112:

CKenergy has not previously adopted this interpretation and is not aware of any such interpretation. This entire matter is about the appropriate legal interpretation of the provision at issue so to claim now it is somehow settled law is preposterous . . . . The RESCTA does not obligate a retail electric supplier to police its territory to ensure another retail electric supplier is not violating the law. OG&E is obligated to comply with the law and this Commission has now found that OG&E is not complying.

¶59 We need not reach that determination today. Whether or not a common practice existed in the industry, it is unquestionable that we saw the Commission's interpretation of this issue for the first time in CKenergy 1. Prior to CKenergy 1, the Commission had never addressed this specific question. In CKenergy 1, the parties asserted and this Court recognized the issue was one of first impression. CKenergy 1, 2023 OK 33

E. Subsequent Amendment to RESCTA

¶60 After we issued our opinion in CKenergy 1, the Legislature added a new paragraph to Section 158.25. See Okla. Session Laws 2023, HB 2845, c. 95, § 1, eff. Nov. 1, 2023. The new provision, designated as paragraph F, states as follows:

F. To achieve the purposes of efficient, cost-effective retail electric service without duplication of electric facilities and to avoid unfairly shifting costs to residential consumers, retail electric service providers are required to establish and utilize rate tariffs which are specifically applicable to a rate class of customers composed of electric consuming facilities being served in accord with the 1,000 kw size exception found in subsection E of this section and located outside the retail electric service provider's certified territory. These tariffs may be for a specific electric consuming facility or for a class of electric consuming facilities taking service under this provision. For retail electric service providers that are rate-regulated by the Commission, the rates supporting this rate class shall be determined in the rate-regulated service provider's most recent rate proceeding. Rates for this rate class shall be designed to recover (i) the costs of extending service to the competitive load of electric consuming facilities of 1,000 kw or larger located outside the retail electric service provider's certified territory; and (ii) the allocated share of other costs associated with providing service to the electric consuming facility. Such tariffs shall be cost-of-service based and shall not subsidize other rate classes or be subsidized by other rate classes. Unless costs of extending service to such a new load are collected from the customer, those costs shall be included in the cost of service study in the next rate proceeding. If the electric service provider, in whose certified territory the competitive load is seeking electric service, chooses in writing not to compete for said competitive load or does not respond within thirty (30) days of receiving written notice by the customer, the terms of this subsection shall not apply.

¶61 We read this amendment to be an additional regulatory effort to protect rural service providers in their own certified territory. The new provision requires rate tariffs for large customers who contract for retail electric service with a foreign supplier instead of with the resident rural cooperative service provider for the territory in which the large customer is located. The rate tariffs will not apply if the large-load customer uses the local supplier, or if the local supplier chooses not to compete for the large-load customer.

¶62 What the amendment does not do is indicate any legislative support for weakening RESCTA's protections for rural electric providers. In fact, by tipping the pricing scales in favor of the rural cooperatives with the new rate tariff scheme, the amendment reiterates the monopolistic gist of the Act -- adding a fiscal restraint on the "cherry picking" of large competitive loads in another provider's certified territory. This is a common thread running through the Act. While the new provision does not expressly discuss the meaning of "extending its service" currently at issue, we find that it does provide further support for our conclusion that the Commission's interpretation is a permissible construction of the Act. The legislature's enactment of the tariffs further justifies overruling CKenergy 1 and departing from the principle of stare decisis.

F. We Must Revisit CKenergy 1

¶63 This Court bears the responsibility to change a court-made rule of law when it deems the change necessary in the interests of justice. Unah By & Through Unah v. Martin, 1984 OK 2676 P.2d 1366Dobbs v. Bd. of Cty. Comm'rs of Oklahoma Cty., 1953 OK 159257 P.2d 802

¶64 In the present case, we have clarified the standard of review which is applicable when the Commission is construing legislation, especially laws governing matters within its special area of expertise, and no constitutional issue is involved. We have also explained what it means for a Commission order to be "sustained by law." These represent the correct principles of law which we now hold should be applied not only in the present case, but also in CKenergy 1. To the extent that CKenergy 1 holds that the Large Load exception permits a retail electric supplier to extend its service by connecting with third-party transmission lines, it is overruled.

G. Prospective-Only Application is Appropriate

¶65 OG&E argues that, if this Court upholds the Commission's interpretation, the ruling should be applied prospectively only, and not in this case or in any other pending cases. OG&E offers several arguments in support of prospective-only application. OG&E asserts that forcing it to build new distribution lines in order to continue serving these customers would result in unnecessary duplication of facilities, and thus contravene the purposes of the Act. OG&E further argues that, because the Commission's interpretation was not "foreshadowed" sufficiently, suppliers have relied upon what they believed to be the de facto Commission policy of permitting suppliers to tap into transmission lines to serve customers under the Large Load exception. OG&E also maintains that retrospective application of a rule banning the use of transmission lines would spawn substantial litigation in the form of copycat actions objecting to similar existing Large Load connections. It asserts that prospective application is appropriate in order to allow a period for adjustment in the industry and avoid disruption of existing activities.

¶66 We agree. This Court is neither prohibited from giving, nor compelled to give, judicial decisions retrospective operation. See Bosh v. Cherokee Cnty. Bldg. Auth., 2013 OK 9Id. at ¶ 25, n.35, 305 P.3d at 1002. Judicial policy determines whether, and to what extent, a new rule will operate retroactively. Id. at ¶ 25, 305 P.3d at 1002; Griggs v. State, ex rel. Okla. Dep't of Transp., 1985 OK 51702 P.2d 1017Bosh at ¶ 25, 305 P.3d at 1002. In making such a determination, we must consider: 1) the purpose of the new rule; 2) the extent of reliance on old doctrines; and 3) the burden likely to be imposed on administering the legal process due to additional litigation or curative actions. Id.

¶67 Our decision today regarding this first-impression issue was not foreshadowed by this Court or the Commission. In fact, this Court reached an opposite conclusion in CKenergy 1, and we recognize that OG&E and other industry participants have relied upon the holding in CKenergy I. Prospective application is appropriate in order to avoid inequity, unfairness, or undue hardship to the retail electric suppliers which have already invested substantial resources in providing service under the Large Load exception, and to their customers who have elected to set up operations in rural locations and obtained electric service in reliance upon this regulatory approach.

¶68 Prospective application is also necessary to further the general purposes of RESCTA to establish orderly development of coordinated statewide retail electric service, to avoid wasteful duplication of facilities, and to preserve the Oklahoma landscape. In the present case, Tall Oak selected OG&E to provide service to the Plant, and OG&E has been doing so for years. People's waited approximately ten (10) months after OG&E executed the agreement to provide electric service to the Plant, and filed its case with the Commission only nine (9) days before OG&E completed construction of its facilities. Retroactive application of our decision would be inappropriate to the extent it would require OG&E and other suppliers to discontinue serving existing customers, resulting in wasteful duplication of facilities and a negative impact on the Oklahoma landscape.

¶69 We hold that today's pronouncement shall apply prospectively only, and shall not apply to existing retail electric services and facilities which have already been established pursuant to RESCTA's Large Load exception.

CONCLUSION

¶70 This Court must affirm if the Commission "regularly pursued its authority" and its "findings and conclusions . . . are sustained by the law and substantial evidence." Okla. Const. art. IX, § 20. Reviewing the Commission's order and analysis in the present case, we conclude that the Commission neither ignored the plain language of the statute, nor imposed a meaning unsupported by any recognized rule of statutory interpretation when it interpreted the meaning of "extending its service." The Commission undertook an appropriate examination of RESCTA, evaluated the legislative intent behind the Act, applied recognized statutory interpretation rules, and followed the plain language of the Large Load exception. We find that the Commission's interpretation is reasonable and is sustained by the law. Accordingly, the Commission's order is affirmed. Our holding shall have prospective application only, and shall not apply to existing retail electric services and facilities which have already been established pursuant to RESCTA's Large Load exception.

AFFIRMED

Rowe, C.J., Kuehn, V.C.J., Darby, Kane, JJ., Bell, S.J., concur
Winchester (by separate writing), Combs, Gurich (by separate writing), JJ., dissent
Edmondson, J., disqualified

FOOTNOTES

See discussion regarding CKenergy 1, infra ¶¶ 10-13.

CKenergy 1 involved competing bids from OG&E and CKenergy Electric Cooperative, Inc., a rural electric supplier, to provide retail electric service to a liquefied natural gas pump station in Caddo County, Oklahoma, within CKenergy's certified territory. Because OG&E's own distribution lines were at least nine miles from the station, OG&E provided its service to the large-load customer by connecting with third-party transmission lines belonging to Western Farmers Electric Cooperative, constructing a new sub-station, and then running low-voltage distribution lines to the station. Oklahoma Gas & Electric Co. v. Okla. Corp. Comm'n, 2023 OK 33535 P.3d 1218

Western Heights opinion cites two cases, In re Estate of Downing, 2021 OK 17489 P.3d 9In re Estate of Foresee, 2020 OK 88475 P.3d 862Western Heights, Downing and Foresee were also appeals from the district court, not the Commission.

Dobson contains a small variation in wording, stating "[c]onstitutional implications as well as statutory interpretation dictate our de novo review of this case." Dobson, 2019 OK 27

Medicine Park's standard-of-review analysis which do not involve appeals from the Commission, and thus contain no helpful authority related to Article 9, Section 20 of the Oklahoma Constitution. Those cases are Neil Acquisition v. Wingrod Investment Corp., 1996 OK 125932 P.2d 1100Fanning v. Brown, 2004 OK 785 P.3d 841

CKEnergy 1, 2023 OK 33Reading Law: The Interpretation of Legal Texts 69 (2012) (the last-antecedent canon provides "[a] pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent.")).

serving an electric consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger." Combined Answer Br. of Appellee Okla. Corp. Comm'n, 10.

17 O.S. 2011, § 158.27

A. The Corporation Commission shall have general supervision over all associations or cooperative corporations as defined herein with power to fix and establish rates and to prescribe rules affecting their services, operation, and the management and conduct of their business. It shall have full visitorial and inquisitorial power to examine such associations or cooperative corporations and keep informed as to their general conditions, their capitalization, rates, plants, equipments, apparatus, and other property owned, leased, controlled or operated, the value of same, the management, conduct, operation, practices and services; not only with respect to the adequacy, security and accommodation afforded by their service, but also with respect to their compliance with the provisions of the Retail Electric Supplier Certified Territory Act, and with the Constitution and laws of this state, and with the orders of the Commission. The provisions of this section shall not be applicable to generation and transmission associations or cooperative corporations, or transmission associations or cooperative corporations.

* * *

D. Upon proceedings brought by an interested person or by action of the Commission, the Commission shall have the jurisdiction to enforce compliance with the Retail Electric Supplier Certified Territory Act, and shall have jurisdiction to prohibit furnishing retail electric service by any retail electric supplier except in its certified territory or territories, or where lawfully serving, and in connection with such enforcement and prohibition to exercise all powers herein or otherwise granted to the Commission.

See discussion infra ¶¶ 69-71, regarding the recent amendment to Section 158.25 requiring additional rate tariffs for large competitive loads who contract for retail electric service with a foreign supplier instead of with the resident rural cooperative.

ruled upon this specific issue, and in reviewing its first-impression determination now before us, we must follow the mandate for limited review in the Oklahoma Constitution.

 

 

Winchester, J., with whom Combs, J. and Gurich, J. join, dissenting:

¶1 Today's pronouncement endorses the Commission's subjective policymaking at the expense of the RESCTA's plain language by imposing restrictions on the Large Load exception which were not expressly carved out by the Legislature. The Act is clear in its stated goals, among them the necessity: "to avoid wasteful duplication of distribution facilities, to avoid unnecessary encumbering of the landscape of the State of Oklahoma, to prevent the waste of materials and natural resources."17 O.S.2021, § 158.23Id. To accept the Commission's interpretation of the meaning of "extending its service" would disregard these stated goals.

¶2 Statutory language must be afforded its "plain and ordinary meaning unless it is contrary to the purpose and intent of the statute when considered as a whole." Stump v. Cheek, 2007 OK 97179 P.3d 606Cattlemen's Steakhouse, Inc. v. Waldenville, 2013 OK 95318 P.3d 1105McIntosh v. Watkins, 2019 OK 6441 P.3d 1094

¶3 Here, the Act provides a Large Load exception to the exclusivity of a rural electric supplier's territory:

The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

17 O.S.2011, § 158.25

¶4 As noted by the Court in Oklahoma Gas and Electric Company v. State ex rel. Oklahoma Corporation Commission, 2023 OK 33535 P.3d 1218CKenergy I), if OG&E were required to run lines from its nearest facility, it would require the encumbrance of several miles of Oklahoma landscape and would be a duplicative waste of materials and natural resources because there are existing open-access transmission lines that can be accessed. Additionally, if OG&E is prohibited from providing competition for the service, the customer will face higher costs as it is forced to accept the lone, more costly bid.

¶5 The plain language of the statute provides that any retail electric supplier may provide service to large loads. The language is clear and unqualified. There are no restrictions on the manner or the mechanism of extending service; no prohibition on the use of transmission lines to extend the service. It is not the Commission's role to add new provisions which the legislature chose to withhold: "Where the meaning of a statute is clear and unmistakable, there is no room for construction, and courts may not search for an interpretive device to fabricate a different meaning." Pentagon Acad., Inc. v. Ind. Sch. Dist. No. 1 of Tulsa County, 2003 OK 9882 P.3d 587

¶6 For these reasons, I dissent.

FOOTNOTES

It is hereby declared to be in the public interest that, in order to encourage the orderly development of coordinated statewide retail electric service, to avoid wasteful duplication of distribution facilities, to avoid unnecessary encumbering of the landscape of the State of Oklahoma, to prevent the waste of materials and natural resources, for the public convenience and necessity and to minimize disputes between retail electric suppliers which may result in inconvenience, diminished efficiency and higher costs in serving the consumer, the state be divided into geographical areas, establishing the unincorporated areas within which each retail electric supplier is to provide the retail electric service as provided in this act

17 O.S.2011, § 158.23

 

 

Gurich, J., dissenting (by separate writing), with whom Winchester, Combs, JJ., join:

¶1 I dissent to the majority's assertion that Oklahoma Gas and Electric Co. v. State ex rel. Oklahoma Corporation Commission (CKenergy I), 2023 OK 33535 P.3d 1218de novo review of the same statute. The order of the Corporation Commission granting the application of People's Electric Cooperative enjoining OG&E from providing service to the Tall Oak Plant should be vacated.

¶2 The majority opinion is based entirely on the interpretation of statutory law included in the Retail Electric Supplier Certified Territory Act (RESCTA), which was enacted over 50 years ago, without regard to the technological advancements that have taken place in that time. The majority mistakenly overlooks the fact that since the RESCTA's enactment in 1971, the Legislature has indicated its intent to keep apprised of the changing technology relating to the electric industry and has endeavored to create competition in that space. As noted in CKenergy I, decided on April 4, 2023, since the enactment of the RESCTA, advances in technology, infrastructure and federal regulation have provided widespread access to electric service.

¶3 The statute in question here, Title 17, Section 158.25, was enacted in 1971 as part of RESCTA. This statute limited the ability of any retail electric supplier to "furnish, make available, render or extend its retail electric service to a consumer for use in electric-consuming facilities located within the certified territory of another retail electric supplier." 17 O.S.2021, § 158.25CKenergy I, the use of open-access transmission lines has not, to this date, been prohibited by statute. The use of open-access transmission lines, in fact, accomplishes the goals of the RESCTA by avoiding the unnecessary encumbering of the Oklahoma landscape and preventing the waste of materials and natural resources.

¶4 Further, since the publication of the opinion in CKenergy I, the Legislature has had ample opportunity to respond to the Court's interpretation of §158.25(E) during the 2023 and 2024 Legislative sessions. It is notable that after CKenergy I was published, the Legislature for the first time in over 52 years, amended Section 158.25. However, in its amendments, the Legislature did not take steps to define "extending its service" nor did it take steps to disallow a retail electric supplier from utilizing third-party open-access transmission lines to provide retail electric service.

¶5 In the current 2025 session, HB 1227 has been introduced which would amend Section 128.25. Notably, it does not attempt to define the term extending its service. It does not prohibit the use of open-access transmission lines. It does not eliminate the large load exception.

¶6 Finally, we must consider the broader implications of this Court's about-face in redefining the term "extending its service." It has been almost two years since this Court released its opinion in CKenergy I. I acknowledge that the majority opinion is prospective only. However, those in the industry understand the consequences of this much better than our Court. We need to be reminded that consistency in law creates predictability, which is essential to individuals as well as to the business sector as a whole. While seeking to protect the exclusive territories, limiting the use of open-access transmission lines will burden the landscape in rural areas. Further, the majority decision applies to OG&E and PSO as well as to the rural electric cooperatives. The cost of duplicitous infrastructure which requires all retail electric providers to build new transmission lines will increase the cost of electric service. The majority's interpretation finds something in the statute--a prohibition against the use of open-access transmission lines--which does not exist. This Court should not ignore the clear legislative intent, repeated many times since 1971, which recognizes that technological advances provide consumers with a more competitive price and access for retail electric power without requiring duplication.

¶7 The majority has presented no compelling rationale to overturn the Court's decision in CKenergy I. Therefore, I dissent.

FOOTNOTES

CKenergy I, 2023 OK 33535 P.3d 1218

17 O.S.2021, § 190.2

Goals of a Restructured Electric Utility Industry

The purpose of this act is provide for the orderly restructuring of the electric utility industry in the State of Oklahoma in order to allow direct access by retail consumers to the competitive market for the generation of electricity while maintaining the safety and reliability of the electric system in this state.

A competitive and diverse retail electric market should result in lower electricity prices for consumers, create business opportunities, and encourage the development of increased and enhanced services.
Monopoly utility regulation has been used as a substitute for competition in the supply of electricity, but recent changes in the energy marketplace and technology as well as the passage of the National Energy Policy Act of 1992 and implementation of Order No. 888 by the Federal Energy Regulatory Commission have resulted in increased competition in the electric generation industry. The introduction of consumer choice in retail electric energy suppliers will result in market forces rather than regulation determining the cost and quality of electricity for all consumers.

Restructuring of the electric utility industry to provide greater competition and more efficient regulation is a national trend and the State of Oklahoma must aggressively pursue restructuring and increased consumer choice in order to provide electric generation service at the lowest and most competitive rates.

The primary goals of a restructured electric utility industry are as follows:

1. To reduce the cost of electricity for as many consumers as possible, helping industry to be more competitive, to create more jobs in this state and help lower the cost of government by reducing the amount and type of regulation now paid for by taxpayers;

2. To encourage the development of a competitive electricity industry through the unbundling of prices and services and separation of generation services from transmission and distribution services;

3. To enable retail electric energy suppliers to engage in fair and equitable competition through open, equal and comparable access to transmission and distribution systems and to avoid wasteful duplication of facilities;

4. To ensure that direct access by retail consumers to the competitive market for generation be implemented in the State of Oklahoma by July 1, 2002; and

5. To ensure that proper standards of safety, reliability and service are maintained in a restructured electric service industry.

It is in the best interest of the citizens of this state to efficiently and expeditiously move forward to increased competition in the generation and sale of electric energy. To ensure a successful transition to a competitive marketplace, a thorough assessment of issues and consequences associated with restructuring shall be undertaken as provided by this act.

17 O.S.2021, § 158.25

The provisions of this act shall not preclude any retail electric supplier from extending its service after September 10, 1971, (1) to its own property and facilities, in an unincorporated area, and (2) subject to subsection D of this section, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

17 O.S., § 158.25

17 O.S.2023, § 158.25

To achieve the purposes of efficient, cost-effective retail electric service without duplication of electric facilities and to avoid unfairly shifting costs to residential consumers, retail electric service providers are required to establish and utilize rate tariffs which are specifically applicable to a rate class of customers composed of electric consuming facilities being served in accord with the 1,000 kw size exception found in subsection E of this section and located outside the retail electric service provider's certified territory. These tariffs may be for a specific electric consuming facility or for a class of electric consuming facilities taking service under this provision. For retail electric service providers that are rate-regulated by the Commission, the rates supporting this rate class shall be determined in the rate-regulated service provider's most recent rate proceeding. Rates for this rate class shall be designed to recover (i) the costs of extending service to the competitive load of electric consuming facilities of 1,000 kw or larger located outside the retail electric service provider's certified territory; and (ii) the allocated share of other costs associated with providing service to the electric consuming facility. Such tariffs shall be cost-of-service based and shall not subsidize other rate classes or be subsidized by other rate classes. Unless costs of extending service to such a new load are collected from the customer, those costs shall be included in the cost of service study in the next rate proceeding. If the electric service provider, in whose certified territory the competitive load is seeking electric service, chooses in writing not to compete for said competitive load or does not respond within thirty (30) days of receiving written notice by the customer, the terms of this subsection shall not apply.